**AMERICAN FIDELITY FIRE INSURANCE COMPANY, Plaintiff**

**v.**

**CONSTRUCCIONES WERL, INC., et al., Defendants**

Civil No. 576-1973

District Court of the Virgin Islands

Div. of St. Croix

November 26, 1975

326

327

329

WILLIAM T. HOLMES, ESQ., Christiansted, St. Croix, V.I., *for American Fidelity Fire Insurance Company*

FEUERZEIG & ZEBEDEE, ESQS. (JOHN A. ZEBEDEE, ESQ.), St. Thomas, V.I., *for Construcciones Werl, Inc.*

JULIO A. BRADY, United States Attorney (Office of the United States Attorney), St. Thomas, V.I., *for Department of Housing and Urban Development*

ROBERT H. RUSKIN, ESQ., Christiansted, St. Croix, V.I., *for Puerto Rico Line, Ltd., San Juan, Puerto Rico*

330

MULLER & MINTZ, P.A., ESQS. (JOSEPH A. CALDWELL, ESQ.), Miami, Florida, *for Napoleon Steel Contractor, Inc.*

NICHOLS & SILVERLIGHT, ESQS. (IRWIN J. SILVERLIGHT, ESQ.), Christiansted, St. Croix, V.I., *for Tropic Plumbing, Inc.*

CONTROLLED CONCRETE PRODUCTS, INC., St. Thomas, V.I.

ROSSKOPF & DEMA, ESQS. (JOHN DEMA, ESQ.), Christiansted, St. Croix, *for Charles Tait, Trustee for Quantum Development Corporation*

DANIEL W. AMBROSE, ESQ., St. Thomas, V.I., *for Virgin Islands Foundation for Housing and Economic Development*

WILLIAM W. BAILEY, ESQ., St. Thomas, V.I., *for Universal Leaf Tobacco Company, Inc.*

WARNER ALEXANDER, ESQ., Christiansted, St. Croix, *for Berens Mortgage Bankers, Inc.*

YOUNG, *District Judge*

## MEMORANDUM OPINION AND ORDER

Plaintiff American Fidelity Fire Insurance Company (hereinafter "AFFIC" or "surety") has moved this Court pursuant to Fed. R. Civ. P. 56 for an order compelling defendant Carla A. Hills, Secretary of Housing and Urban Development (hereinafter "HUD"), to pay some $220,268.00 in retainages, allegedly owing on the "Thomasville" Project, into court. Defendant HUD, in addition to opposing the granting of AFFIC's motion, has moved for a dismissal of plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(2). Finally, defendant Construcciones Werl, Inc. (hereinafter "WERL") has also moved

for an order of dismissal alleging, like HUD, that this is not a proper interpleader action.

## I

### BACKGROUND FACTS

The history of this litigation is rather long and complex. Back in December of 1971, plaintiff AFFIC, a New York bonding company, became a surety on two federally subsidized housing projects[1] in the Virgin Islands (the construction contracts for which had been awarded to Quantum Development Corporation (hereinafter "QUANTUM" or "CONTRACTOR) by the Virgin Islands Foundation for

---

[1] The Federal Housing Administration (hereinafter "FHA") was created by the National Housing Act of 1934 (48 Stat. 1246, 12 U.S.C. § 1701) for the purpose of encouraging improvement in housing standards and conditions, providing an adequate home financing system by insurance of housing mortgages and credit, and exerting a stabilizing influence on the mortgage market. It operates not by making loans or undertaking construction itself but rather by insuring private lenders against loss on their mortgages. The basic rental housing project mortgage insurance program is authorized under Section 1713 of Title 12 of the United States Code and governed by the regulations contained in 24 C.F.R. § 207 issued pursuant thereto. This is augmented by a rent supplements payments program authorized by 12 U.S.C. § 1701s and governed by 24 C.F.R. § 215, a low and moderate income mortgage insurance program authorized by 12 U.S.C. 1715L and governed by the regulations found in 24 C.F.R. § 221, a mortgage insurance and interest reduction payments program authorized by 12 U.S.C. § 1715z-1 which is governed by 24 C.F.R. § 236, a special mortgage program for low and moderate income families authorized by 12 U.S.C. § 1715z-2 and governed by the regulations found in 24 C.F.R. § 237, and a supplementary financing program for insured project mortgages authorized under 12 U.S.C. § 1715z-6 and governed by 24 C.F.R. § 241.

In 1965, by operation of the Department of Housing and Urban Development Act (79 Stat. 667), the FHA was transferred to the Department of Housing and Urban Development (HUD) where it is now an organizational unit. It is headed by the Federal Housing Commissioner (hereinafter "FHC") (also known as the Assistant Secretary for Housing Production and Mortgage Credit) who is backed up by an administrative staff which includes a Deputy Federal Housing Commissioner, an Executive Assistant Commissioner, and Directors of various HMPC–FHA offices. These, in turn, are supported by numerous regional administrators, each with their own supportive personnel. Various sections of the above-mentioned Department of Housing and Urban Development Act and National Housing Act (See 12 U.S.C. §§ 1701c(a), 1702, 1715b and 1715z-1(h)) provide the legislative authority for the Secretary of HUD to promulgate powers and duties to such officers and employees of HUD as he may designate.

Housing and Economic Development (hereinafter FOUN-DATION" or "MORTGAGOR") by issuing payment and performance bonds. The furnishing of such bonds, in satisfaction of the requirements of the Miller Act, 49 Stat. 793 (1935), as amended 40 U.S.C. §§ 270a–e (1970), is standard practice when awarding construction contracts for public buildings to private contractors. The payment bond guarantees that any materialmen or subcontractors remaining unpaid by the general contractor will be remunerated by his surety up to a certain amount (in this instance, $387,-500.00 at each project) while the performance bond assures the owner and his mortgagee that in the event that the general contractor defaults before completing the project, they will be saved harmless up to a contractually prescribed monetary limit (also $387,500.00 per project in this situation).

Forming the predicate for this litigation, QUANTUM, the general contractor, ran into financial difficulties and was ultimately adjudicated a bankrupt in June of 1972. As part of the denouncement of the bankruptcy hearings, the referee entered an order on August 24, 1972 requesting the surety to fulfill the requirements and obligations expressed in the construction contracts for the housing projects. AFFIC thereupon entered into two separate contracts with defendant WERL regarding completion of the "Thomasville" project—which completion was allegedly effectuated in June of 1973. Since that time, AFFIC has attempted to obtain first from the original mortgagee, Berens Mortgage Bankers, Inc. (hereinafter "BERENS" or "MORTGAGEE"), and then from its assignee (HUD), some $220,268.00 in retainages in order to apply these unpaid sums towards the substantial losses which it suffered in fulfilling its role as surety.

In addition to actively pursuing first BERENS and then HUD, plaintiff AFFIC apparently also attempted some

"self-help" cost-cutting measures of its own for on September 11, 1973, defendant WERL filed suit in the Superior Court of Puerto Rico, District of San Juan, alleging that AFFIC owed it in excess of $80,000.00 for its part in finishing the "Thomasville" project after QUANTUM's default. This filing, it may be assumed, was the catalyst precipitating AFFIC's own breach of contract action against WERL which was filed in this Court on November 15, 1973. Following some intricate procedural jockeying in which AFFIC sought to amend its complaint in order to sound in rule interpleader and WERL moved to dismiss the suit for AFFIC's failure to state a compulsory counterclaim, I allowed AFFIC to amend in view of the possibility that the retainages in question might be subject to multiple adverse claims, denied WERL's Fed. R. Civ. P. 13(a) motion, and stayed the Puerto Rican action while enjoining all interpleader defendants from instituting, maintaining, or prosecuting any suit at law or in equity against AFFIC with respect to the Thomasville retainages. (See Memorandum Opinion and Order filed by this Court on December 18, 1974.)

Ten months have come and gone and the parties are before this Court again. The procedural posture of this litigation has changed in the interim and several parties have been added or dropped. But the basic issues, like "Old Man River", just keep rolling along.

It should be apparent that in developing a matter for trial, some time needs be expended in clarification and crystallization of the disputed points. Admittedly, the period of gestation for this stage of preparation will vary depending, among other factors, upon the number of parties to the lawsuit and the complexity of the issues. But at some ill-defined mark on the time-space continuum, the scales of justice are thrown out of equilibrium when delay and obfuscation are allowed to run unchecked. Justice is poorly

served when unnecessary parties are required to needlessly participate ad infinitum and/or non–related claims are forced into juxtaposition with each other. And without expressly declaring that such a point has been reached here, it would be dishonest if the Court did not admit that this factor has played some role in its ruling on the submitted motions.

## II

### WERL'S MOTION TO DISMISS

On December 18, 1974, I entered an order restraining WERL from maintaining its breach of contract action against AFFIC in the Superior Court of Puerto Rico. In order to arrive at that decision, the Court first found that it was entertaining a Rule 22 interpleader action. Then, having determined the nature of the action before it, the Court buttressed its granting of a preliminary injunction by declaring it to be "necessary in aid of jurisdiction". I ruled the interpleader action would lose a great deal of its effectiveness if AFFIC were forced to defend, in several jurisdictions, multiple actions all arising out of the same transaction. Both judicial economy and the effective resolution of all claims emanating from the "Thomasville" default led me to believe that all parties asserting a colorable claim to the retainages in question should be compelled to appear before this Court.

Shortly thereafter, WERL filed a motion for reconsideration in which it asked me to vacate the aforementioned order and to dismiss the interpleader action as against it. At that time, WERL argued that the funds which AFFIC allegedly owed to it arose out of their post-bankruptcy contract and not from any prebankruptcy transactions. Accordingly, it was *not* claiming under either the original QUANTUM contract or under the payment or performance bonds executed by AFFIC pursuant to its role as surety.

Moreover, mention was also made of the fact that AFFIC had been actively participating in the Puerto Rican suit. Therefore, WERL asserted that it was not a proper interpleader defendant and consequently the Puerto Rican action should be allowed to continue.

Upon hearing oral argument and reviewing the submitted briefs, this Court decided to reaffirm its earlier position and accordingly denied WERL's motion for reconsideration and dismissal. I wrote that the preliminary injunction was only a tentative measure, "essentially insuring that a future determination that Construcciones Werl is a proper interpleader-defendant in the instant action would not be rendered meaningless by a prior judgment by the Puerto Rican Court. If, on the other hand, WERL is hereafter determined to be an improper interpleader-defendant, the preliminary stay may be vacated, thereby permitting a continuance of the Puerto Rican action". (See Memorandum Opinion and Order filed on February 6, 1975.)

Now WERL is before the Court again with essentially a repetition of its earlier motion for dismissal of the interpleader action. However, for reasons appearing infra, I feel compelled to consider the motion de novo.

Rule 22 is one of two types of interpleader actions which Title 28 of the United States Code authorizes. Both are equitable devices designed to insure that an organization or individual faced with the possibility of conflicting claims of liability can secure a determination concerning its or his liability-in-fact as between the competing complainants. As Moore states:

Interpleader is a procedural device which enables a person holding money or property, in the typical case conceded to belong in whole or in part to another, to join in a single suit two or more persons asserting mutually exclusive claims to the fund. The advantages of such a device are both manifest and manifold. A many-sided dispute is settled economically and expeditiously within a

single proceeding; the stakeholder is not obliged to determine at his peril which claimant has the rightful claim, and is shielded against the possible multiple liability flowing from inconsistent and adverse determinations of his liability from different claimants in separate suits; even in those cases where there is little threat of multiple liability, the stakeholder is freed from the vexation of multiple lawsuits and may be discharged from the proceeding so that the true dispute will be settled between the true disputants, the claimants; the claimants are benefited as well, since search for and execution upon the debtor's assets are obviated, the spoils of the contest being awarded directly out of the fund deposited with the court. (Footnotes omitted.)

(3A Moore's Federal Practice § 22.02 (1) at 3003–5.)

Traditionally, interpleader was restricted to situations where the stakeholder feared two or more mutually exclusive claims on the res. These claims were derived from or dependent upon a common source; the interpleading party claimed no interest in the subject matter; and the stakeholder was not otherwise independently liable to any of the claimants. (4 Pomeroy, Equity Jurisprudence § 1332.)

The preceding technical requisites, it should be apparent, seriously undercut the value of the interpleader device. Consequently, the courts became liberal in their approach and gradually interpleader evolved into its now well-settled practice of being invoked whenever two or more claims are mutually inconsistent in the sense that a decision upon the merits in favor of one of the claimants necessarily determines that the remaining claimants are left with no legal entitlement to any portion of the particular fund or property. See Texas v. Florida, 306 U.S. 398 (1939).

Recently, however, interpleader's utility has been extended to cover the situation where the claims asserted, while not being mutually exclusive, are, in the aggregate, greater than the limited liability of the stakeholder. This is the famous "pie-slicing" situation wherein the court assumes the role of pater familias and endeavors to protect

337

the stakeholder against multiple vexation as well as to assure a fair distribution among the clamoring creditors. See State Farm Fire and Casualty Co. v. Tashire, 386 U.S. 523 (1967). Interestingly enough, the most frequently occurring example of this type of interpleader is that of the surety interpleading a string of subcontractors and materialmen on its payment bond. See, for example, Aetna Casualty and Surety Co. v. B.B.B. Construction Corporation, 173 F.2d 307 (2nd Cir. 1949), Massachusetts Bonding and Insurance Company v. Antonelli Construction Co., Inc., et al., 173 F.Supp. 391 (D. Mass. 1959), Pennsylvania Fire Insurance Company v. American Airlines Inc., et al., 180 F.Supp. 239 (E.D.N.Y. 1960), National Surety Corporation v. Globe Indemnity Company, 331 F.Supp. 208 (E.D. Pa. 1971) and Emmco Insurance Company v. Frankford Trust Company, et al., 352 F.Supp. 130 (E.D. Pa. 1972).

■ Regardless of the type of interpleader, however, the stakeholder must have a real, reasonable, and bona fide fear of exposure to double liability or to the vexation of conflicting claims upon the same fund or property. In short, the *adverse* nature of the competing claims must be sufficiently established. See, in this regard, Bierman v. Marcus, 246 F.2d 200 (3rd Cir. 1957), cert. denied sub nom Milmar Estate, Inc. v. Marcus, 356 U.S. 933 (1958), John Hancock Mutual Life Insurance Company v. Beardslee, 216 F.2d 456 (7th Cir. 1954), cert. denied 348 U.S. 964 (1955), Francis I. du Pont & Co. v. O'Keefe, 365 F.2d 141 (7th Cir. 1966), and Fulton v. Kaiser Steel Corp., 397 F.2d 580 (5th Cir. 1968).

■ As noted, supra, the requisite adversity is normally found to exist in instances where the totality of claims of unpaid materialmen, suppliers, and subcontractors exceeds the face amount of the payment bond required by the Miller Act, 40 U.S.C. §§ 270(a) et seq. As such, it represents an effort to balance the equities between the participating

surety and the actual suppliers and laborers, security for whom the Miller Act was intended to effectuate. U.S. for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 216–7 (1957).

The previously mentioned cases, however, uniformly dealt with the situation where the obliging surety was confronted with numerous materialmen, suppliers, and sub-contractors whom the defaulting general contractor had neglected to pay prior to its default. No case has been found which speaks directly to the issue of whether a post-default creditor of the surety should be forced to join the class of pre-default creditors of the principal. But sound reasoning and two helpful cases point the way to the decision which this Court has reached.

I will not recite the involved facts in National Surety Corporation v. Globe Indemnity Company, 331 F.Supp. 208, 210 (E.D. Pa. 1971), but will quote from that part of the opinion which fairly summarizes and explains the court's decision not to grant plaintiff's interpleader motion. This is found at pages 210 and 211 therein:

> It is obvious, therefore, that this *Court will not grant interpleader where it feels no good will flow from the order. Such is the case here.* The plaintiff's own pleadings make it clear that *there are suits pending* by the defendants against themselves and plaintiff *which are independent of the alleged fund sought to be interpleaded by National Surety.* Globe, for example, has sued the Commonwealth for money allegedly due from one county contract, regardless of whether or not the Commonwealth has paid that money to National Surety. The United States claims monies from the Commonwealth by reason of its tax lien, which the United States may be able to recover regardless of the fact that the Commonwealth has paid those monies to National. *Globe's claims against the Commonwealth and National have no relationship to the fund,* so that it may continue those actions without regard to the determination made in this case. It is obvious, therefore, that this one action will not settle the many claims outstanding among the parties to this suit. (Emphasis supplied.)

Again, without reciting the complicated facts involved in Frank Briscoe Company, Inc., et al. v. Albert Pick Co., Inc., et al., 282 F.Supp. 321, 326, (D.N.J. 1968), I quote from the Court's ratio deciendi:

*The facts here disclose a situation where there are two funds growing out of a common origin, but with each fund having its own claimants. To entertain this interpleader action merely to further the remedial intent of Congress would be in conflict with the stated jurisdictional requirements set forth in Section 1335* and would moreover under the peculiar set of facts presented, have a diluting effect upon the other remedial provisions of the Bankruptcy Act and the Miller Act as available to the parties presently before the Court. It would indeed be a perversion of the purpose of the Interpleader Act to allow it, in the context of this case, to defeat the other remedies presently being pursued by the various claimants before this Court. (Emphasis supplied.)

It would appear that these cases provide a sufficient basis upon which to rest a ruling in support of WERL's motion to be dismissed from the interpleader action. Together, they stand for the proposition that an interpleader action, whether rule or statutory, will not lie where there are independent funds each with its own claimants— even if the two funds arose out of a common origin.

In the matter sub judice, AFFIC's liabilities to most of the other defendants (see part V, infra), whatever they may be, all accrued prior to the date of QUANTUM's bankruptcy and arose out of the surety's payment and performance bonds. As such, any liability found to exist would be limited to the face amount of the bonds and the competing claimants would have to share in a pro-rata distribution.

WERL's rights, on the other hand, do not result from the aforementioned bonds but arise out of the contracts it separately entered into with AFFIC. Hence, should its claim prove successful, it would not be limited in its recovery by the funds which AFFIC is seeking to have de-

posited in court or to the face amount of the bonds. In fact, WERL has not even argued that it should be allowed to participate in any recovery from the bonds, retainages, or undisbursed mortgage proceeds. (See part III, infra.)

In view of the foregoing, WERL's motion to dismiss should be granted. However, inasmuch as counsel expressed willingness during oral argument to stay before this Court, the previously entered restraining order will be continued —leave being given to WERL to remove its action from the Puerto Rican forum to this one pursuant to 28 U.S. §§ 1441 (a) and 1404 (a).

## III

### PLAINTIFF AFFIC'S MOTION TO COMPEL HUD TO PAY THE $220,268.00 "RETAINAGES" INTO THE COURT'S REGISTRY

Having determined that WERL should be dismissed from the interpleader action sub judice, I now proceed to the matter pressed by the surety. Plaintiff has moved this Court for summary judgment, pursuant to Fed. R. Civ. P. 56, to compel HUD to pay into the registry of the Court for the benefit of the parties to this Rule 22 action those funds which it is currently holding. The $220,268.00 in question allegedly represents retainages held under the "Thomasville" construction contract which should have been paid to the surety thirty (30) days after the aforementioned project was "fully completed". HUD, as BEREN's assignee, argues that the funds are not construction "retainages" but rather constitute "undisbursed mortgage proceeds". Alternatively, even if they are retainages, HUD contends that they should be subject to a set-off for liquidated damages.

Both sides, in support of their respective contentions, have drawn upon the line of cases which represent the progeny of Pearlman, infra. Notwithstanding their best efforts to

341

the contrary, this Court remains unconvinced that the resolution of this hotly contested motion involves an application of the principles enunciated in those cases. Accordingly, I have filed as a supplement to this Opinion a separate historical and jurisprudential analysis tracing the development of Prairie State National Bank v. United States, 164 U.S. 227 (1896), Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404 (1908), United States v. Munsey Trust Company, 332 U.S. 234 (1947), Pearlman v. Reliance Insurance Company, 371 U.S. 132 (1962) and related cases. Because of the length of that analysis, I have chosen not to insert it into the body of this Opinion but rather to incorporate it by reference only.

What the Prairie-Henningsen line of cases do indicate, however, is a persuasive judicial philosophy with respect to the surety's relative position. That philosophy, though never having been expressly articulated, can be stated as follows: First, when the surety is proceeding under its performance bond, it is in a stronger position than when it is relying upon its payment bond; second, the Government down through the years has tried a variety of arguments in an attempt to force the Courts to treat the surety's posture under both bonds identically; and finally, the only one of those arguments which has been favorably received by the Courts has been that of liquidated damages. However, even in that situation, the surety is entitled to a judicial determination as to whether the Government's assessment of liquidated damages is proper. When seen from this perspective, the government's argument in the matter sub judice—that the fund in question represents undisbursed mortgage proceeds under the building loan agreement rather than retainages under the construction contract— can be seen for what it truly is: an attempt to avoid this decisional line of authority giving the surety sacrosanct status when it is proceeding under its performance bond.

342

On the other hand, the line of cases stemming from Prairie and Henningsen all involved instances where the government was a party to the construction contract. In the matter sub judice, the government's relationship with the parties arises solely out of its position as mortgage insurer and provider of monthly interest reduction payments pursuant to Section 236 of the National Housing Act, (12 U.S.C. § 1715z-1). Thus, although the government has not so argued, it is debatable whether the aforementioned decisional authority is even applicable to the situation herein involved. So stated, the tension, between a judicial philosophy of favoring sureties and a clearly distinguishable party postural arrangement, abruptly surfaces.

Plaintiff AFFIC makes several arguments in support of its motion to compel HUD to pay the retainages into the registry of the court. Initially, it cites paragraphs 3(C), 3(D), 5(C) and 10(C) of the construction contract which specify the conditions required, in addition to that of "fully completed", before the contractor can receive the final payment. These conditions are:

(i) Inspection and approval by the appropriate local governmental agency;

(ii) Issuance of a certificate of occupancy by the same;

(iii) Issuance of an occupancy permit by the F.H.A.;

(iv) Disclosure of all unpaid obligations;

(v) Survey drawings showing site improvements and utilities; and

(vi) A Contractor's Certificate of "Actual Cost" supported by a C.P.A.'s certification of the same.

Believing these six conditions have been met, plaintiff contends it should receive the retainages or at least have them paid into the Court's registry by virtue of its having "fully completed" the project after QUANTUM's default.

HUD does not argue that these six requirements remain unsatisfied. However, its position is that the condition

343

of "full completion" has not yet occurred because there has been no "final closing" of the "Thomasville" project. Plaintiff's position, on the other hand, is that "full completion" does not mean "final closing" but rather "substantial completion". Thus, the issue is clearly drawn.

I find both positions to be without merit. "Substantial Completion" is defined by paragraph 2(D) of the construction contract as being "the date the FHA Chief Underwriter signs the Final Project Inspection Report (FHA Form No. 2449)". It would indeed require a tortured reading of this document to determine that two obviously different terms, one of which has been clearly defined in terms of procedural requisites, mean the same thing.

This does not mean, however, that I concur with HUD's definition of the term "fully completed". That term refers to *physical* termination of the project. "Final closing", on the other hand, is a date when papers are shuffled and the legal position of the parties is redefined and clarified. To hold that the two are synonymous would imply that a housing project could be physically completed, have full occupancy, be serving its intended objective, and yet not be "fully completed" if final closing were delayed indefinitely.

Accordingly, since neither party's interpretation of "fully completed" is accepted, I must arrive at one of my own in order to determine whether that event, however defind, has occurred. Unfortunately, the construction contract here in question has not been artfully drafted and this makes the going rougher. Nevertheless, some determination must be made for it is a prerequisite to reaching the next stage of the surety's argument—i.e., given "full completion" of the project by the performing surety, it is entitled to the retainages.

■ Article 2 of the aforementioned construction contract delimits the time requirements of the contract. Paragraph (A) thereunder specifies a date of "completion" and

authorizes an extension of that date in accordance with the terms of AIA Document A201 ("General Conditions of the Contract for Construction") but only with the prior written approval of the Federal Housing Commissioner. Paragraph (B) provides that "(t.)he Contractor shall correct any defects due to faulty materials or workmanship which appear within one year from the date of substantial completion". And Paragraph (D), as noted earlier, defines "substantial completion". Given these provisions, I find that "fully completed" refers to the *earlier* of "final closing", one year from the date of "substantial completion", or the date of correction of any defects due to faulty materials or workmanship which appear within one year from the date of "substantial completion". Accordingly, it is hereby determined that the project is "fully completed" inasmuch as "substantial completion" occurred on June 7, 1974, and all defects of materials and workmanship have since been corrected. Under the circumstances of this case, I rule that it is immaterial that "final closing" has not yet transpired.

Having determined that the Thomasville project is "fully completed", I must now decide whether the funds which HUD is holding are contract retainages or undisbursed mortgage proceeds and, depending upon their characterization, whether AFFIC is entitled to them either as a completing surety under the equitable doctrine of subrogation, as a third-party creditor beneficiary of the building loan agreement, as an assured-promisee under the mortgage insurance commitment agreement, through some equitable lien argument, or under the doctrine of unjust enrichment.

Until recently, this question never arose. Funds which the government was found to have in its possession were uniformly treated as either earned but unpaid progress payments or as construction retainages. Apparently rely-

ing on all these past cases, plaintiff urges the Court to consider these funds as contractual retainages—for if these funds can be so classified, then the heavy weaponry of Prairie Bank-Henningsen, etc., could be brought in to summarily dispose of this motion.

What the surety ignores (and what I have briefly alluded to earlier) is the fact that in the aforementioned line of cases, the contractor had entered into a contract with the government to do one thing or another. The federal government, in short, was the owner of the property, a direct recipient of the contractor's promise to perform, and a party to the construction contract. In return for the contractor's promise to build, paint, repair, or whatever, it gave its promise to pay.

█ The situation sub judice is markedly different. The government enters the picture only by virtue of its insurance commitment and periodic interest reduction payments. It is presently holding the funds only because of a statutorily-authorized assignment. (See 12 U.S.C. §§ 1713(g), 1715b, 1715z-1(a) and (j) and the regulations issued pursuant thereto, to wit: 24 C.F.R. §§ 207.258(b), 236.251, and 236.260.) It is neither the owner of the property nor a party to the construction contract.[2] Moreover, while it undoubtedly benefits indirectly from the successful completion of the housing project,[3] it cannot by any means be said to be a direct recipient of the contractor's promise to perform. Nor, obviously, is it under any obligation to pay the con-

---

[2] The fact that HUD approval is required before certain contractual conditions can be deemed fulfilled is *not* sufficient to treat HUD as a de facto party to the construction contract itself. It may be the case that HUD should be considered a third party beneficiary of the construction contract. But we need not and accordingly do not reach that issue at this time.

[3] 12 U.S.C. § 1701t provides: "The Congress affirms the national goal, as set forth in section 1441 of Title 42, of 'a decent home and a suitable living environment for every American family' . . . [I]n the carrying out of such program there should be the fullest practicable utilization of the resources and capabilities of private enterprise and of individual self-help techniques." (Pub.L. 90-448, § 2, August 1, 1968, 82 Stat. 476.)

tractor for the latter's successful performance of its contractual obligations.

██ The short of the matter is that there is no relationship between the general contractor and HUD based upon the construction contract. HUD, therefore, cannot be said to be holding contractual retainages and, accordingly, the surety, even if subrogated to the rights of the general contractor, cannot go after the funds which HUD is holding on a theory based upon contractual retainages.[4]

██ If the funds which HUD is presently holding pursuant to a statutorily-authorized assignment from BERENS are not contract retainages, then what are they? The answer is that they represent undisbursed mortgage proceeds and whatever cash deposits BERENS insisted that the FOUNDATION place into an escrow account. (See 24 C.F.R. §§ 236.1, 221.540, and 221.542.) Had these funds been paid to the mortgagor by the mortgagee, they would have become contractual retainages in the hands of the mortgagor. Since, however, they never were disbursed but, owing to the mortgagor's default, were instead assigned to HUD, they retained their initial characterization of undisbursed mortgage proceeds.

Having determined that the funds in controversy represent undisbursed mortgage proceeds, the basic issue remains whether the surety can nevertheless reach them. Plaintiff AFFIC relies upon Travelers Indemnity Company v. First National State Bank of New Jersey, 328 F.Supp. 208 (D.N.J. 1971) for the proposition that it can recover these funds as a third-party creditor beneficiary of the building loan agreement. AFFIC also argues that it can recover in its own right as a surety through the equitable doctrines of subrogation, equitable lien, and unjust enrich-

---

[4] I do not find that the mere fact that paragraph 9(D) of the construction contract *notices* the existence of a building loan agreement is sufficient to incorporate that agreement into construction contract.

ment. Finally, plaintiff's third theory upon which it premises its right to recoup the funds is that as a promisee-assured under HUD's commitment of insurance to the mortgagee (BERENS), it benefits from the letter of commitment which undertook not only to insure the mortgagee against loss but also to guarantee the reasonable expectations of the general contractor and its surety that upon full performance on their part, they would receive the agreed upon contractual payments.

HUD relies upon the recent case of Trans-Bay Engineers & Builders v. Lynn, 396 F.Supp. 275 (D.D.C. 1975) to refute all of the theories under which AFFIC is proceeding. Alternatively, it argues that if the surety is deemed to be a third-party creditor beneficiary of the building loan agreement, then HUD should be considered a third-party beneficiary of the construction contract and be entitled to rely upon the provisions therein—specifically its liquidated damages clause.[5]

In reply, the surety contends that the release which it received from the mortgagor (FOUNDATION) relieves it from the onus of the liquidated damages provision of the construction contract and, in any event, since neither HUD nor BERENS were parties to the construction contract, they cannot rely upon any of the paragraphs contained therein to defeat plaintiff's claim to the withheld funds.

Finally, in response to this contention, HUD takes the position that the release itself violated section 9(A) of the construction contract which required the prior written consent of the mortgagee and the commissioner. Moreover, HUD asserts that it can enforce various provisions of the construction contract as a third-party beneficiary

---

[5] HUD's argument, that the funds are undisbursed mortgage proceeds for the assurance of the project's completion (and not for the security of the general contractor) and hence must be retained until "final closing" is without merit since I have already determined that "fully completed" is *not* synonymous with "final closing" and that the project is "fully completed" as of the date of this opinion.

thereof for FOUNDATION's release does not bind HUD since it was granted without HUD's approval as required by the 17th article of the building loan agreement.

Since the respective positions of the two parties are drawn from and fundamentally depend upon the two district court cases previously cited, I have found it necessary to make another analytical study. Again, however, in the interest of keeping this Opinion from becoming unduly lengthy, that analytical study has been reduced to a separate memorandum, filed separately, but incorporated herein by reference.

Since most readers of this Opinion may not read the separate memorandum just described, it will be useful to recapitulate herein certain salient features of the Travelers and Trans-Bay opinions by way of comparison. Travelers involved a suit by the *surety* and co-trustees in bankruptcy of the general contractor whereas, in Trans-Bay, the general contractor himself was the moving party. In both situations, the project owner (mortgagor) occasioned the default by failing to make monthly interest payments. In both cases also, the contractor satisfactorily completed construction and the project was accepted by the mortgagor with the mortgagee's and HUD's approval. In one case (Travelers), the default occurred prior to successful completion of the project but construction continued until completion. In the other, default did not occur until after completion and approval. Both courts held that the plaintiffs (in the one case, the surety and co-trustees in bankruptcy, in the other, the general contractor) to be creditor third-party beneficiaries of the building loan agreement. Both judges also concurred that the suit was one for recovery of undisbursed mortgage proceeds and, as such, was founded upon the building loan agreement and governed by its terms. Any provisions in the construction contract, favorable or otherwise, were not controlling and

could not be relied upon. Finally, both Judge Wortendyke and Judge Smith agreed that HUD was the proper defendant by virtue of the statutorily-authorized and contractually-provided for assignment and that the mortgagee could not be held liable for the undisbursed mortgage proceeds because of that same assignment. It is at this point, however, that the similarities cease.

In Travelers, the surety was proceeding under its payment bond and the Court held that the surety was entitled to the undisbursed mortgage proceeds by finding the surety to be a creditor third-party beneficiary of the building loan agreement under both traditional contractual and suretyship doctrines governing third parties and explicit HUD regulations and provisions in the building loan agreement specifying the mortgagee's obligations. However, the Court did hint that had the mortgagor given the requisite notice to the general contractor, the plaintiffs would not have been entitled to assert any claim for monies due and owing for work performed *after* the notice of default. (328 F.Supp. at p. 217.) In Trans-Bay, on the other hand, the Court held that the general contractor could not recover the undisbursed mortgage proceeds because, as a third-party beneficiary of the building loan agreement, it was bound by provisions contained after its default. Furthermore, the Court held that suretyship doctrines or other equitable theories could not be invoked to award the general contractor the proceeds since invocation of those doctrines would nullify the express terms of the building loan agreement.

The preceding features of the two aforementioned cases have been emphasized because they are significant when juxtaposed to the circumstances in the matter sub judice. As in Travelers, this is a suit brought by the surety—but here it is proceeding under its performance bond. The instant controversy's catalyst, as in both Trans-Bay and

350

Travelers, was the mortgagor's failure to make monthly interest payments. Again, as in both cases, the project was accepted by the mortgagor-owner (FOUNDATION) with HUD's approval. The default here, as was the situation in Travelers, occurred prior to the successful completion of the project. Here, however, the general contractor went into bankruptcy prior to the mortgagor's default and it was the surety, not the contractor, who completed construction. Moreover, the surety's role was not limited to one of merely paying claims. It also undertook to finish physical construction of the housing project.

Plaintiff's first argument, that it is entitled to the fund in question as a performing surety under the equitable doctrine of subrogation fails because, as stated earlier, the funds in question are not contractual retainages but rather undisbursed mortgage proceeds and escrow deposits. The long line of cases which AFFIC has cited in support of its position all deal with situations where the general contractor had entered into a contract directly with the federal government or one of its agencies. Accordingly, both parties owed each other contractual duties which the surety, by being forced to perform pursuant to its statutorily-required bond, was entitled to enforce. The situation here is markedly different. HUD entered the picture only as the insurer of a private mortgage and as the provider of monthly interest reduction payments. These functions did not lift HUD into being a party to the construction contract; neither did the provisions of the construction contract calling for HUD approval. Hence, even if the surety was subrogated to the contractor's rights by virtue of its having completed the project, there were no rights emanating from the construction contract to which the surety could be subrogated. Therefore, the Prairie-Henningsen line of cases is inapposite and plaintiff cannot recover the funds on this theory.

The surety's second contention is that given the surety nature of the retained fund, it is entitled to payment therefrom by virtue of its having completed performance of the project. The short answer to this argument is that it was the *mortgagor* who was acting as its own surety. (Travelers at p. 215.) AFFIC was a surety *for* QUANTUM, the general contractor. By no stretch of the imagination can it be considered a surety for FOUNDATION, the mortgagor. Accordingly, I hold that the performing surety has no claim of entitlement to the undisbursed mortgage proceeds and escrow deposits *under this* particular theory.

Similarly, I hold that the surety cannot recover the funds under its theory of being an assured-promisee under HUD's commitment of insurance to BERENS. First of all, AFFIC was not a party to the commitment agreement. And secondly, it cannot be considered a third-party beneficiary of this contract for the simple reason that HUD's commitment to insure was issued over seven and one-half months *before* the building loan agreement or construction contract came into existence. At that time, AFFIC could not have known that it would become the general contractor's surety on the "Thomasville" project.

Next, plaintiff relies upon the Travelers holding in support of its contention that it is entitled to the funds as a creditor third-party beneficiary of the building loan agreement. HUD does not dispute the surety's characterization of itself as a creditor third-party beneficiary of the building loan agreement but argues that Trans-Bay is the relevant case. It offers the holding therein, that a creditor third-party beneficiary is bound by the terms and conditions of the contract it invokes and cannot accept the benefits while avoiding the burdens or limitations, in opposition to AFFIC's alleged entitlement to the funds which HUD is presently holding after BEREN's assignment.

Since both of these opinions were based in large part, upon specific provisions of their respective building loan agreements, it becomes necessary to examine the particulars of the BERENS–FOUNDATION building loan agreement.

The building loan agreement involved herein initially declares that the purpose of the loan provided for is to aid the borrower in the construction of its housing project. And articles (4)(a), (4)(b), (4)(d), (4)(e), (9) and (18) go on to define the rights and obligations of the various parties thereto. It should be noted that articles (4)(a) and (4)(e) are identical to the same numbered paragraphs found in the Trans-Bay building loan agreement while articles (9) and (18) are identical to clauses (10) and (14) of the agreement involved in Travelers. Moreover, articles (4)(b) and (4)(d) are similar to, but not the same as, the analogous provisions (clauses (4) and (5)) of the Travelers building loan agreement. Finally, there is no comparable provision in the instant agreement to that of clause (13) of Travelers.

I find that article (9) provides the mortgagee with two alternative courses of action in the event of the mortgagor's default.[6] Option one is to let the building agreement continue to operate with the mortgagee entering into possession of the premises and itself completing any necessary work and improvements. If this alternative is selected, then the undisbursed mortgage proceeds and sums in the escrow account[7] are automatically assigned to it. This assignment, however, becomes operative if and only if the funds are used to complete the project. If they are not so used, then the conditional assignment does not become effective. The second procedure which the mortgagee can pursue

---

[6] These alternatives are in conformance with HUD-issued regulations. See 24 C.F.R. §§ 236.251, 207.258, and 236.255.

[7] The requirement of an escrow account and the purpose for which such a sum is intended are found in 24 C.F.R. §§ 236.251, 207.19(c), 236.1, 221.530, and 221.542.

upon the mortgagor's default is to terminate the mortgage agreement, file an insurance claim, and assign the building loan agreement, mortgage, note, and any funds remaining unadvanced under the mortgage to the Secretary of HUD. As to the escrow account funds, it may use and apply them in whatever manner and for whatever purpose the Federal Housing Commissioner prescribes. As the facts reveal, BERENS elected to pursue a modification of the second alternative—the modification being an assignment of the escrow account as well.[8]

Inasmuch as article (18) merely encompasses the Secretary of HUD within the definition of "lender" when there has been an assignment of the building loan agreement to him, and since this is in conformance with similar statutory and regulatory provisions,[9] I find that nothing so far modifies or contravenes the basic regulatory obligation (24 C.F.R. § 236.1 and 24 C.F.R. § 221.512) of the mortgagee or its assigns to extend the full amount of credit under the building loan agreement[10] when a decision has been made to allow the project to be completed despite the mortgagor's default. Judge Wortendyke reached a similar conclusion in Travelers[11] based upon these clauses as well as three others. Clause (13) therein, which provided for the payment of the "holdback" upon the completion of the entire project to the commissioner's satisfaction, complemented clause (4) which provided for the payment of the last earned

---

[8] This assignment occurred after default. Note, however, that 24 C.F.R. §§ 207.261, 236.251, and 236.260 provide for assignment even if there has been no default.

[9] This definition, it should be noted, in fact mirrors the definition of "mortgagee" found in 12 U.S.C. §§ 1707, 1713(a) and 1715z-1(j)(2)(C), and the regulations issued thereunder, to wit: 24 C.F.R. §§ 207.251(g) and 236.251.

[10] The regulations themselves provide that they shall be considered a part of any and all building loan agreements. See 24 C.F.R. §§ 236.251 and 207.254.

[11] The regulation considered in the Travelers opinion, 24 C.F.R. § 297.3(b), is identical with 24 C.F.R. § 221.512. It provides: "The mortgagee shall be obligated, as a part of the mortgage transaction, to disburse the principal amount of the mortgage to, or for the amount of, the mortgagor or to his creditors for his account and with his consent."

354

progress installment to the borrower upon the acceptance of the project by the mortgagee with the commissioner's approval. As previously stated, there is no comparable provision in the instant building loan agreement to said clause (13). However, article (4)(b) is sufficiently analogous for me to find that (4)(b)'s language evidences an intent to include both earned but unpaid progress installments as well as any "holdback" within its coverage. Moreover, I also find that the discretion granted to the commissioner by these provisions ("as the commissioner authorizes" v. "with the approval of the commissioner") is identical in intent if not in language. Accordingly, it is my determination that the addition of article (4)(b) does nothing to upset my basic finding that nothing in the building loan agreement changes the aforementioned regulatory obligation of the mortgagee or his assigns to disburse the full principal amount of the mortgage to the creditors of the mortgagor for his account.

It is to be noted that article (4)(d) herein, which is similar to clause (5) of the Traveler's building loan agreement, supports this regulatory obligation by requiring the mortgagor to hold the funds advanced *in trust* for the purpose for which they were so intended. Therefore, it is but a small step to further find, which I do, that the same trust fund applies to earmarked funds which have not been so advanced when construction itself is allowed to continue under either HUD's explicit or open and tacit approval.

The question then becomes whether either articles (4)(a) or (4)(e) requires a change in the findings. Clearly, article (4)(a) cannot do so for it merely shows how the "holdback" comes into existence. That leaves article (4)(e). This provision provides that the mortgagee is no longer required to advance funds out of the proceeds of the loan *to the mortgagor* if the loan becomes out of balance

or if the mortgagor goes into default[12] under the loan agreement, note or mortgage. Judge Smith, in Trans-Bay, effectively utilized this singular provision to prevent the plaintiff therein from recovering. As noted previously, he felt that the plaintiff, as a third-party beneficiary, assumed the legal rights and position of the mortgagor and therefore could not claim entitlement to the funds when the mortgagor could not due to the latter's default.

 With all due respect to Judge Smith, I disagree with his characterization of the legal position of the creditor third-party beneficiary in situations such as the one involved in the matter sub judice. I concur with his assertions that the beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract, that the third-party beneficiary assumes the legal obligations as well as the rights of its promisee and, that if the promisee fails to satisfy one of the conditions which it promised in consideration for the promisor's conditional promise, then the promisor is relieved of its duty to perform. In short, under such circumstances, the creditor third-party beneficiary can no more seek to enforce the promisor's obligation than its promisee could. (See, Restatement of Contracts § 140.) The point is, however, that these are *not* the circumstances of this case. True, the promisee has not fulfilled one of its promises—i.e., not to go into default. However, the surety, who has succeeded to the legal position of its promisee, has completed performance of the housing project. And while said performance may be "defective" in the sense that it was preceded by a default, nevertheless the law is clear that the "promisor's duty is not discharged by the defective performance of a condition or of a return promise if he accepts the performance with knowledge of or reason to know of the defects . . . ." (Restatement

---

[12] The definition of "default" provided by paragraphs (4) (e) and (9) of the building loan agreement carefully track the language of the regulations. See 24 C.F.R. §§ 236.251, 207.255, 207.256, and 236.25.

of Contracts § 298(1).) Accordingly, since both BERENS and its assignee, HUD, accepted the performance of the surety in completing the project subsequent to the mortgagor's default, they cannot claim that FOUNDATION's default relieves them of their obligation to advance the remainder of the funds due under the building loan agreement. I therefore hold that AFFIC is entitled to have these funds paid into the Court's registry under its creditor third-party beneficiary theory.

 AFFIC's next argument is that it is entitled to recover the funds under traditional equitable lien and unjust enrichment theories. An equitable lien is, as the name implies, a creature of equity. It is a right, not recognized by law, to have a fund or specific property applied to the payment of a particular debt and is based upon the older equitable doctrine of unjust enrichment. (See, in this regard, United States v. Adamant Co., 197 F.2d 1, 10 (9th Cir. 1952), cert. den. sub nom. Bullen v. Scoville, 344 U.S. 903 (1952), citing 53 C.J.S., Liens § 4 and 33 Am.Jur., Liens § 18.) Before a court will impress an equitable lien upon the identifiable fund or property, it must be clear that the parties *intended* that the particular piece of property or fund be so charged. (Jamison Coal & Coke Co. v. Goltra, 143 F.2d 889, 893–4 (8th Cir. 1944), cert. den. 323 U.S. 679 (1944).) But once it is established that the res is security for the discharge of an obligation, then anyone discharging that obligation, if not a volunteer, can look to the fund for repayment. (Cleveland Clinic Foundation v. Humphrys, 97 F.2d 849, 856 (6th Cir. 1938), cert. den. 305 U.S. 628 (1938).)

There is no question that there is an identifiable res upon which an equitable lien could be placed in the instant litigation. But so was there one in Trans-Bay. The court therein, however, refused to invoke the equitable lien doctrine because to do so would have nullified express terms of

the building loan agreement. And, according to Judge Smith, "equity will not set aside legal obligations in order to provide relief for parties later disadvantaged . . . ." (396 F.Supp. at p. 272, citing 5A Corbin on Contracts § 1125.)

Unlike whatever may have been the case in Trans-Bay, plaintiff herein has more than met its burden of demonstrating that HUD would be unjustly enriched should it be allowed to retain the funds which it is presently holding. Regardless of how we have chosen to label the funds in the hands of different parties, the fact remains that the mortgagor borrows money from the mortgagee in order to pay the general contractor for his work. The funds may be called undisbursed mortgage proceeds in the hands of the lender, contractual retainages in the possession of the borrower, and earnings when received by the contractor. Nevertheless, they are ultimately designed to be paid to the general contractor in return for his successful performance under the construction contract.[13]

Of course, the contractor has no absolute right to payment. He must fulfill his side of the bargain before he can demand that the owner-mortgagor live up to its promise of payment. But if he defaults and the surety takes over and ultimately fully performs, then the surety stands in the shoes of a general contractor who has fully performed. In such a situation, it would be close to unconscionable for the lender to argue that merely because the middleman in the flow—schematics of the funds (the borrower) has defaulted, it has a higher claim to the funds than the ultimate performer—the completing surety. And when the lender's assignee presses that very same contention, it becomes chutzpah.

Not only does the performing surety have a higher equitable claim to the fund then does HUD (denial of which

---

[13] Even the payment provisions of the construction contract and the building loan agreement track each other closely. See articles 3(B) of the construction contract and (4)(a) of the building loan agreement.

358

would clearly confer an unjust enrichment upon the federal agency), but also it has been denied the possibility of earning substantial interest income on this not inconsiderable sum of money. When a project has been completed, when all that remains is to close and correct the ravages of vandalism caused by the delay in closing, and when HUD is at least partially responsible for the delay in closing while the surety has relatively "clean hands",[14] it would be inequitable to allow HUD to retain the funds. And I shall not countenance such an unjust enrichment.[15]

Having established an equitable foundation for the surety's claim to the proceeds, we run squarely into Judge Smith's remark that equity will not set aside legal obligations. With all due respect to the learned Judge, I feel that he has misconstrued what Professor Corbin was saying. Sections 1122 and 1125 therein clearly demonstrate that the defaulting contractor can always bring a quantum meruit action. Whether he is successful, of course, depends upon the relationship between the injury caused by the breach and the benefit conferred upon the defendant. As Corbin himself states:

. . . The question whether a plaintiff who is himself in substantial default should be given any restitutionary remedy must be considered in connection with the equitable rules against the enforcement of penalties and forfeitures. If a contractor has com-

---

[14] The delay in closing the "Thomasville" project was occasioned by a dispute between HUD and the Government of the Virgin Islands as to who was to be responsible for trucking water to the site, by the refusal of WERL to turn over the keys to the project to FOUNDATION, and by WERL's inability to timely produce the cost certification records required by its construction contract with AFFIC. All of these problems have since been ironed out and "final closing" is apparently near.

[15] HUD's position, that relieving it of the funds will remove whatever leverage it possesses to bring the project to final completion, is utterly without merit under the present set of circumstances. First of all, I have already ruled that the "Thomasville" project has been "fully completed". But even more importantly, AFFIC is not asking that the funds be paid over to it. Rather, it is seeking their deposit into the court. And this court will not release those funds to the surety until either the damage done by the vandalism is remedied or until it has been convinced that the surety was not responsible for, nor by its conduct contributed to, the theft and destruction which occurred.

mitted a total breach of his contract, having rendered no performance whatever thereunder, no penalty or forfeiture will be enforced against him; he will be required to do no more than to make the injured party whole by paying full compensatory damages. In like manner, a contractor who commits a breach after he has rendered part performance must also make the injured party whole by payment of full compensatory damages. The part performance rendered, however, may be much more valuable to the defendant than the amount of the injury caused by the breach; and in such case, to allow the injured party to retain the benefit of the part performance so rendered, without making any return performance and without making restitution of any part of such value, is the enforcement of a penalty or forfeiture against the contract breaker. (5A Corbin on Contracts, § 1122 at p. 3. Footnotes omitted.)

In short, since the basis of recovery under quantum meruit is the principle that it would be inequitable and unjust for the defendant to retain the benefit conferred upon him by the plaintiff's performance without paying therefor, Judge Smith erred in declaring that equity cannot set aside legal obligations. The legal obligations are not set aside; they are *surmounted* and transcended by equitable considerations.

Finally, we must confront HUD's argument that it is a third-party beneficiary of the construction contract and, as such, entitled to peruse its rights thereunder. Specifically, it contends that since the project was not completed on time, it ought to be allowed a set-off for liquidated damages. Plaintiff does not dispute that article 2 (C) of the construction contract provides that $670.32 shall be the measure of liquidated damages for each day of delay until the date of substantial completion. However, it argues that HUD is neither a party to nor a beneficiary of the construction contract and accordingly cannot seek to enforce one of the provisions contained therein. Alternatively, even if HUD is deemed to be a third-party beneficiary, plaintiff asserts that the release which it obtained from FOUNDATION

estops HUD from pressing that point. In reply HUD argues that the release in question did not have HUD's approval as required by article 9(A) of the construction contract and by article 17 of the building and loan agreement. Moreover, its execution (by Darwin D. Creque, President of FOUNDATION), it is further alleged, was done without authorization from the FOUNDATION's Board of Directors and, as such, constituted an "ultra vires" act.

 It is clear that HUD was not a party to the construction contract. Nor do I feel that the various requirements in the construction contract calling for HUD's approval of certain procedures lift HUD into party status. Hence, HUD must buttress its contentions upon the assertion that it is a third-party beneficiary to the construction contract. There is no question that given the national goal set out in 12 U.S.C. § 1701t, HUD would be indirectly benefited by the completion of yet another low-income housing development. Moreover, if a project falls through, then HUD loses the monthly interest reduction payments which it has made as well as being called upon to pay the sums provided for by its insurance commitment. But such benefits are merely incidental and secondary. At most, HUD could be considered an incidental beneficiary. In no event can it be deemed to be a creditor or donee beneficiary. (See Restatement of Contracts, § 133.) Accordingly, I must hold that HUD cannot seek to enforce the provisions of the construction contract. (Restatement of Contracts, §§ 133, 134, 139, and 147.)

 As to the possibility that President Creque acted "ultra vires" in executing the release, HUD has proferred no affidavit from the FOUNDATION's Board of Directors to that effect nor has it submitted any By-Laws or Certificate of Incorporation of the FOUNDATION setting out

361

the powers and functions granted to the presidential office. Certainly, HUD was content to have Creque execute all other documents involved in this matter. Therefore, if it first now seeks to raise the "ultra vires" issue, it runs into a potential problem of estoppel.[16] More importantly, however, without affidavits or instruments to the contrary, I find that one ought to expect that the president of a corporation has authority to execute an instrument of release, especially if he has executed all other documents without being required to prove his authority with directors' or shareholders' resolutions.

This brings us to HUD's assertion that the release violated article 17 of the building and loan agreement. That article reads:

> The Borrower shall not transfer, assign or pledge any right or interest in, or title to, any funds deposited by the Borrower with the Lender, or reserved by the Lender for the Borrowers, without the prior written approval of the Lender and the Commissioner.

Certainly, HUD cannot be relying upon the first part of that sentence for liquidated damages are not funds deposited with the Lender. Similarly, it cannot fall back upon the second half of the quoted provision. Liquidated damages are not a fund in the sense that "holdbacks" or escrow deposits are. They merely represent a contractual stipulation as to the amount of damages to be recovered by the owner should the contractor be in breach of the construction contract and, accordingly, only fix the amount to be paid in lieu of performance. Therefore, the aforementioned article 17 is inapplicable here. No liquidated damages "fund" or "sum" was ever reserved or established and

---

[16] Technically, "ultra vires" refers to a *corporation's* acting beyond the powers conferred upon it by its charter. When an officer is said to have acted improperly, the proper accusation is that he has acted without authority. Nevertheless, I have ignored this "technicality" because the essence of HUD's point is clear and it deserves to be answered on the merits.

hence the borrower could never transfer, assign, or pledge any interest in or title thereto.

Having said all this, however, it remains a fact that the project was not completed on time and therefore the liquidated damages provision was automatically triggered. FOUNDATION should it have so elected, would have been entitled to the appropriate amount of damages. Moreover, its assignee would be so entitled. Accordingly, once the funds in question have been deposited in Court, FOUNDATION may then argue that Creque acted without authority in granting AFFIC its release and, if successful upon that point, go on to present evidence as to what is the appropriate quantum of liquidated damages.

* * *

In summary, AFFIC is entitled to have HUD pay the $220,268.00 into this Court's registry under both its creditor third-party beneficiary (of the building loan agreement) and equitable lien and unjust enrichment theories.

## IV

### DEFENDANT HUD'S MOTION TO DISMISS

Finally, I reach the third of the motions presented to the Court for disposition. Defendant HUD has moved this Court to dismiss the surety's amended complaint on the grounds that:

(i) this Court lacks both jurisdiction over the subject matter of this action as well as personal jurisdiction over the defendant;

(ii) plaintiff does not have standing to bring this suit; and

(iii) this is an improper interpleader action.

HUD initially argues that 28 U.S.C. § 1346(a)(2)[17] requires this action to be brought in the Court of Claims since it is a contract action exceeding $10,000.00. Moreover, HUD contends, since jurisdiction does not exist either by 12 U.S.C. § 1702[18] or by 28 U.S.C. § 2410(e), it asserts that plaintiff has failed to allege any proper jurisdictional basis.

HUD is quite correct in its contention that neither 12 U.S.C. § 1702 nor 28 U.S.C. § 2410(e) are jurisdiction-conferring statutes but are merely legislative acts waiving sovereign immunity.[19] Hence, if jurisdiction is to exist, some other statutory basis must provide it.

Quite clearly, there is no federal question jurisdiction under 28 U.S.C. § 1331. The fact that sections of the National Housing Act or its implementary regulations are invoked by the parties does not magically transform this action into one arising under the laws of the United States. (See Lindy v. Lynn, 501 F.2d 1367, 1369 (3d Cir. 1974).) Neither, quite clearly, is 28 U.S.C. § 1337, providing for jurisdiction over proceedings arising under acts regulating commerce, applicable. Further, the requisite diversity for 28 U.S.C. § 1332 jurisdiction is not satisfied.

---

[17] Title 28 U.S.C. § 1346(a)(2), otherwise known as the Tucker Act, provides that:

 (a) The District Courts shall have original jurisdiction, concurrent with the Court of Claims, of:

 * * *

 (2) Any other civil action or claim against the United States, not exceeding $10,000.00 in amount, founded * * * upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort.

[18] The last sentence of 12 U.S.C. § 1702 declares:

 The Secretary (of Housing and Urban Development) shall . . . be authorized in his official capacity to sue and be sued in any court of competent jurisdiction, State or Federal.

[19] See, for example, General Electric Credit Corporation v. Grubbs, 447 F.2d 286, 287 (5th Cir. 1971), rev'd. on other grounds in 405 U.S. 699 (1971), Merge v. Sharott, 341 F.2d 989, 995 (3d Cir. 1965), George H. Evans & Co. v. United States, 169 F.2d 500, 502 (3d Cir. 1948), and Ferguson v. Union National Bank, 126 F.2d 753 (4th Cir. 1942).

■ The foregoing, however, does not mean that this Court has no jurisdiction. Unlike most other federal district courts, this is an Article I and not an Article III court. This means that we do not need diversity as a predicate for entertaining litigation. Under section 22 of the Revised Organic Act, approved July 22, 1954, this district court has the original jurisdiction

. . . of a district court of the United States in all causes arising under the Constitution, treaties, and laws of the United States, regardless of the sum or value of the matter in controversy, and has general original jurisdiction in all other causes in the Virgin Islands, where exclusive jurisdiction is not conferred upon the municipal court . . . .

Since this is an action for which exclusive jurisdiction has not been conferred upon the municipal court (as the inferior court of the Territory) and inasmuch as this cause of action arose in the Virgin Islands, I find that this court has subject matter jurisdiction.

However, HUD argues that the Tucker Act (28 U.S.C. § 1346(a)(2)) limits this Court's jurisdiction to entertain suits for breach of contract. The answer to that is two-fold. First, this is a Rule 22 interpleader action and not a breach of contract dispute. The fact that AFFIC asserts to the contrary in its pleadings and supporting memoranda is not controlling when plaintiff's attorney has obviously made an error in appellation. When one party presents allegations of one genre but mistakenly labels them to be of another, this Court will not be so baroque and technical as to honor form over substance. More importantly, however, there has been a substitution of parties—HUD and AFFIC both stipulating to the replacement of the United States of America by Carla Hills, Secretary of HUD. And the decisional law is quite clear that a district court's jurisdiction to entertain a suit based upon 12 U.S.C. § 1702 is not limited by the Tucker Act. Accordingly, since both personal

365

and subject matter jurisdiction exist, HUD's motion to dismiss based upon this ground is denied.

■■■ HUD's second ground for dismissal is that plaintiff surety has failed to comply with certain sections of the Virgin Islands Code; specifically, 13 V.I.C. §§ 373, 401, 531, and 533(a). As such, HUD asserts that AFFIC lacks standing to bring and prosecute this cause of action.

Section 373 requires a foreign corporation to file an annual financial report if it has "qualified to do business". Before a "qualified" foreign corporation can "do any business", section 401 requires it to file its certificate of incorporation, a certificate stating the name of its authorized agent in the Virgin Islands upon whom service of legal process against it may be made, and a statement of its assets, liabilities, and capital stock with the office of the Virgin Islands Government Secretary. Moreover, every foreign corporation "qualified to do business" in the Virgin Islands must pay an annual franchise tax to the Commissioner of Finance. (13 V.I.C. § 531.) Failure to pay said tax, according to section 533(a), renders the corporation ineligible to commence or maintain any action in any court until it pays its tax.

AFFIC has admittedly failed to comply with any of the foregoing statutory provisions. It contends, however, that these sections are inapplicable because they apply only to foreign corporations "qualified to do business". Accordingly, the issue is clearly drawn.

Comments (a) and (b) of Section 297 of the Restatement of Conflicts reflect the widely-held fact that it is customary for a state (or territory) to place various types of limitations upon the privilege of a foreign corporation to do business, or to conduct other activities, within its territory. In particular, most states refuse to permit actions on local transactions to be brought in their courts by foreign corporations which do business within their territory

without having complied with their statutory requirements. However, most states do allow foreign corporations to perform certain acts within their territory without qualifying to do business—provided that quantum of activity is neither large nor frequent.

Admittedly, whether a particular foreign corporation must comply with a given state's qualification requirements before conducting any activities or doing business therein is a matter to be determined by local law—subject always to federal constitutional limitations. (See comments (a) and (e) of the Restatement of Conflicts, § 311.) Hence, we should look to the Virgin Islands law to determine whether AFFIC was obligated to fulfill the qualification requirements enumerated in the previously mentioned statutory provisions. Unfortunately, Virgin Islands statutory and decisional law is silent on the point. This means, therefore, that we must approach the question on first principles.

The "doing business" statutes are intended to regulate a foreign corporation's conduct within a state when those activities constitute a *substantial* part of its ordinary or customary business. (35 Am. Jur. 2d, Foreign Corporations § 317.) It is my opinion that the ordinary business of a surety is executing bonds to assure the obligee of performance by the principal. These bonds are backed-up by a penal sum—in this case, $387,500.00 per project. Hence, the principal performs or the surety must pay. Since the bonds were executed in Puerto Rico, inasmuch as 31 C.F.R. § 223.5(b) (issued pursuant to 6 U.S.C. § 6 et seq.) provides that a surety need not be admitted to do business in the jurisdiction in which the contract is to be performed if it is admitted to do business in the jurisdiction in which the bond was executed, and insofar as AFFIC was admitted to do business in Puerto Rico at the time the bonds were written and is still admitted there, I hold that

there was no need for plaintiff to have qualified to do business in the Virgin Islands. Accordingly, the previously cited statutes are inapplicable and AFFIC has standing to bring and prosecute this action.

Certainly there would be no disagreement over this point had the surety paid out the penal sum and then sought recovery from HUD. The question might arise as to whether its election to complete construction in lieu of payment of the designated penal sum changes my decision. Under the circumstances of this case, I hold that it does not.

Assuming, arguendo, that when the surety undertook to complete construction of the project it ceased performing the customary business of surety companies, then it ought to have qualified to do business as a quasi-construction company. It should have foreseen that the completion of the "Thomasville" project would be a difficult and time-consuming undertaking, not an isolated non-continuous venture. AFFIC should have anticipated that the project's completion was not going to happen without detailed supervision by it. It should have realized that it would be entering into a different line of business and, as such, ought to have qualified legally in the Virgin Islands before attempting the same. Since AFFIC did not do so, it should be barred from maintaining an action in the Virgin Islands where it did "do business" without so qualifying.

However, a foreign corporation which has done business in a state (or territory) without having complied with that State's qualification requirements may nevertheless maintain an action in a sister state (or territory) in the federal or state courts even though it could not maintain the action in the state where it did business (Restatement of Conflicts § 312.) This means that AFFIC *could* have brought this suit in Puerto Rico.

While theoretically it could have done so, it *was not* able to because of my previous order staying all proceed-

ings in the Superior Court of Puerto Rico. As will be recalled from Part II, supra, while admitting that hindsight has revealed my earlier restraining order to be in error, I nevertheless have kept it in effect while granting leave to the parties to proceed in this Court. Under these circumstances, plaintiff must be allowed all the rights and remedies in this Court which it would have been entitled to had it remained in the Puerto Rican forum. One of the rights which it would have had was standing to bring suit. Accordingly, it is my decision that plaintiff has standing herein.

■ HUD's third contention in support of its motion to dismiss is that this is an improper interpleader action because 28 U.S.C. § 1335 does not authorize suits against the United States and Congress did not waive sovereign immunity by the enactment of the interpleader statute.

To begin with, this is a Rule 22 interpleader action and not a statutory one. However, this does not dispose of HUD's argument since the same could be alleged about rule interpleader. What is dispositive, however, is a reconsideration of the function of an interpleader suit.

Interpleader, it will be recalled, is a tool used for forcing competing adverse claimants to litigate inter sese their rights to a particular fund which the interpleading party is holding or expects to obtain. The primary utility of this procedural device is that it eliminates exposure to multiple liability when the aggregate of the claims exceeds the limited liability of the stakeholder as represented by the size of the fund. Here, several parties have filed claims against AFFIC arising out of the "Thomasville" project. We have already decided that WERL belongs in a different class from most of the other claimants in that most of the other claimants can look only to the fund in question for satisfaction of their claims. But it is precisely those claimants asserting rights against the "retainages" which creates

369

the condition precedent for the interpleader device. There is a serious possibility that the aggregate amount of their claims may exceed the $220,268.00 fund which AFFIC hopes to eventually obtain. Given this possible exposure to multiple liability, we must conclude, as did the court in Emmco, supra, that this is a proper interpleader action. Therefore, HUD's motion for dismissal fails on this ground also.

## V

### SEVERANCE

■ In the concluding portion of Part II of this Memorandum Opinion and Order, I alluded to the fact that I was not satisfied with the procedural posture of this case as it has developed. At that time, I stated that I felt that there were two groups of claimants herein involved who did not belong together and who ought not to be similarly treated. One group involves all those parties whose claims accrued *prior* to the date of QUANTUM's bankruptcy and arose out of plaintiff's payment and performance bonds. Should plaintiff ultimately be deemed liable, said liability would be limited to the face amount of the bonds. The other group consists of those parties whose claims arose out of separate contracts which they entered into with AFFIC after it took over for QUANTUM following the latter's default. As such, those claims (should liability be found to exist) would not be limited by the amount of "retainages" or the penal sum stated in the bonds. Rather, those entities could seek to satisfy their judgments from AFFIC's entire net worth.

Clearly, to have let this litigation proceed so far apace without remedying this situation earlier was a mistake. Having now realized the error, I cannot aggravate matters by sitting back and doing nothing. Some sort of remedial or carving-up procedure is clearly mandated. Various pro-

visions of the Federal Rules, such as Fed. R. Civ. P. 20(b) and 42(b), were considered but eliminated for reasons that I need not enumerate. I have, however, selected Fed. R. Civ. P. 21 as the most appropriate "surgical scalpel".

Rule 21 is a mechanism for correcting either the misjoinder or non-joinder of parties or claims. Its text is silent, however, as to what constitutes misjoinder or non-joinder. Nevertheless, the cases make it clear that misjoinder of parties arises when they fail to satisfy any of the conditions of permissive joinder under Rule 20(a). Thus, Rule 21 applies when the claims asserted do not arise out of the same transaction or occurrence or do not present some common question of law or fact. (See Sun-X Glass Tinting of Mid-Wisconsin, Inc. v. Sun-X International, Inc., 227 F.Supp. 365 (D.C. Wisc. 1964) and La Chemise Lacoste v. General Mills, Inc., 53 F.R.D. 596 (D.C. Del. 1971), aff'd, 487 F.2d 312 (3rd Cir. 1973).) A misjoinder of parties is also frequently declared when no relief is demanded from one or more of the parties joined as defendants. (9 Wright & Miller, Federal Practice and Procedure: Civil § 1683 at pp. 322–3, citing Sabolsky v. Budzanoski, 457 F.2d. 1245 (3rd Cir. 1972, cert. den. 409 U.S. 853 (1973).)

Moreover, the Court can, under Rule 21, also sever unrelated claims and afford them separate treatment when to do so would be in the interest of some of the parties. (9 Wright & Miller, Federal Practice and Procedure: Civil § 1689 at pp. 345–6. See also Sun-X, supra, Insull v. New York World Telegram Corp., 172 F.Supp. 615 (N.D. Ill. 1959), aff'd on other grounds 273 F.2d 166 7th Cir. 1959), cert. den. 362 U.S. 94 (1960), and Philadelphia Dressed Beef Co., v. Wilson Co., 19 F.R.D. 198 (E.D. Pa. 1956).) This broad power stems from the last sentence of Rule 21 which clearly authorizes the court to sever and proceed separately with the misjoined claims. (3A Moore's

Federal Practice ¶ 21.05[2].) Moreover, severance can be ordered upon the court's own initiative. Accordingly, the relief I am about to fashion is buttressed upon Rule 21.

As I have stated several times already, there are two distinct groups of claimants seeking to recover sums from AFFIC. One group (Group I) consists of parties who must look to the "retainages". This group includes: Charles Tait (QUANTUM's trustee in bankruptcy), HUD, FOUNDATION, Universal Leaf Tobacco Company, Inc., Napoleon Steel Contractors, Inc., and Puerto Rico Lines, Limited.[20] Group II, on the other hand, consists of WERL, FOUNDATION, Tropic Plumbing, Inc., and Controlled Concrete Products, Inc.[21] This group can look to the entire net wealth of AFFIC to satisfy any judgment it might receive inasmuch as AFFIC's potential liability to them arises from the WERL–AFFIC postbankruptcy construction contract. While all these multifarious claims were occasioned by QUANTUM's default, they cannot be said to be related. Accordingly, I am severing Group II's claims from the instant action and shall proceed with them independently. This means that from now on there shall be two distinct actions in this court: AFFIC v. Group I and AFFIC v. Group II.

### ORDER

Upon consideration of plaintiff AFFIC's motion for summary judgment, defendant HUD's motion for dismissal,

---

[20] Universal Leaf Tobacco Company, Inc. manufactured the modules in Virginia. Puerto Rico Lines, Limited shipped the modules from Virginia to the dock in St. Thomas. Napoleon Steel Contractors, Inc. delivered them from there to the site of the "Thomasville" project pursuant to a subcontract with Puerto Rico Lines. These last two parties have been included in the first group because the facts, as they have been presented to me, indicate that QUANTUM had entered or was about to enter into a shipment contract for the modules with Puerto Rico Lines at the time of its bankruptcy. Should these facts prove incorrect, i.e., should AFFIC itself have entered into the contract with Puerto Rican Lines, Limited, then obviously these two parties would belong to Group II.

[21] WERL subcontracted out part of its duties under the AFFIC-WERL construction contract to Controlled Concrete Products, Inc., and Tropic Plumbing, Inc. Note that Napoleon Steel Contractors, Inc. and Puerto Rican Lines, Limited might also be members of Group II. See fn. 20, supra.

and defendant WERL's motion for dismissal; the memoranda of points and authorities in support thereof and in opposition thereto; oral argument of counsel having been heard; and for the reasons set forth in the Memorandum Opinion of even date herewith, it is ORDERED that:

1. American Fidelity Fire Insurance Company's motion shall be and is hereby GRANTED;

2. Housing and Urban Development's motion shall be and is hereby DENIED;

3. Construcciones Werl's motion shall be and is hereby GRANTED; and

4. This action shall henceforth be and is hereby divided into two separate, distinct, and independent actions: American Fidelity Fire Insurance Company v. Group I, the successor to this interpleader action, and American Fidelity Fire Insurance Company v. Group II, a new breach of contract action. The members of each defendant group shall be stated in a separate Order to be made within ten (10) days from the date hereof which will permit sufficient time for the Court to receive any objections by anyone as to his or its inclusion in one or the other groups as set forth in the Memorandum Opinion.

## THE RIGHTS OF SURETIES

This memorandum, which constitutes part of the Opinion in American Fidelity Fire Insurance Company v. Construcciones Werl, Inc., et al. (filed November 24, 1975), traces the development of the rights of sureties, starting with the famous Prairie Bank case, infra, and continuing up to the present time. If there is a common unifying thread running through all these decisions, it is that the Courts appear to be engaged in a never-ending endeavor to continually enlarge the rights of the surety, so necessary to the proper functioning of the laissez-faire construction market.

Prairie State National Bank v. United States, 164 U.S. 227 (1896), marks the beginning of this investigation. In Prairie, Charles Sundberg & Company entered into a contract with the United States for the erection of a customhouse in Galveston, Texas. Charles A. Hitchcock became the company's surety by furnishing a combination performance-payment bond pursuant to a provision in the construction contract. Some two years later, in consideration of past and future advances, the Company assigned to the Prairie State National Bank its final payment under the contract. Shortly thereafter, the company defaulted and Hitchcock completed performance. Conceding that it was a mere stakeholder, the government refused to pay either party until they resolved their respective claims to the 10% retainages inter sese. This they were incapable of doing and the Secretary of the Treasury transmitted their claims to the Court of Claims pursuant to a request by the Comptroller of the Treasury. The Court of Claims held that Hitchcock was entitled to the fund and entered judgment accordingly. The Prairie Bank thereupon appealed and a cross-appeal was taken by the United States in order that it might be protected from double liability in the event that the Supreme Court held that Prairie Bank was entitled to any part of the fund.

Justice White, writing for the Court, characterized the struggle as a battle between two equitable claims: the bank asserting an equitable lien which it claimed arose on the date of its advance, prior in time to the date the surety assumed its obligations; and the surety asserting that its equitable right (via the doctrine of subrogation) to the retainages arose on the date it executed its contract of suretyship, prior in time to the date of the bank's advances. (164 U.S. at p. 230.) The sole question therefore was

 . . . whether the equitable lien, which the bank claims it has, without reference to the question of its subrogation, is paramount

374

to the right of subrogation which unquestionably exists in favor of Hitchcock. In other words, the rights of the parties depend upon whether Hitchcock's subrogation must be considered as arising from and relating back to the date of the original contract, or as taking its origin solely from the date of the advance by him.

Finding that Hitchcock was subrogated not only to the rights of Charles Sundberg & Company but also to the securities and remedies which the United States as a creditor was capable of asserting against its debtor, the Court reasoned that Hitchcock was entitled to be substituted to the rights which the United States might have asserted against the fund. If the surety had failed to avail itself of the privilege of completing the work, it would have been entitled to use the retainages as an offset against what it would have owed the government for the latter's extra cost of completing the project. Therefore, by analogy, if the surety fulfilled the obligations of the general contractor, it ought to have a claim upon the retainages as well. As the court stated on p. 233:

> That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration is as much for the indemnity of him who may be guarantor of the performance of the work as for him for whom the work is to be performed; that it raises an equity in the surety in the fund to be created; and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority.

Accordingly, the Court went on to apply the foregoing principles and concluded that since Charles Sundberg & Company could not transfer to the bank any greater rights than it had in the fund as of the date of the assignment, and inasmuch as these rights were subordinate to those of the United States into whose shoes the surety had stepped by virtue of completing the contract, the bank's equity in the fund was subordinate to that of the surety's. Prairie at p. 240.

The Court's next encounter with competing claims of sureties and banks came in Henningsen v. United States Fidelity & Guaranty Company, 208 U.S. 404 (1908). R.M. Henningsen had contracted with the United States for the construction of certain buildings at Fort Lawton, Washington. United States Fidelity & Guaranty Company became the surety on the project by furnishing a combination performance-payment bond. Shortly thereafter, Henningsen made a written assignment of all payments which were then due or which might thereafter become due on account of the contract to the National Bank of Commerce of Seattle in order to secure payment of a loan made by the bank to him. This time, the buildings were constructed in accordance with the terms of the contract but the contractors failed to pay certain claims for labor and materials. The surety paid the claims and since they amounted to more than the penal amount of the bond and the 10% retainages, it brought suit to restrain the bank from collecting or accepting the balance due on the contract from the United States.

As in Prairie, the Court characterized the dispute as one involving a question of competing equities. Henningsen at p. 410. It treated the surety's payment of the laborers' and materialmen's claims as accomplishing a release not only of the contractor's obligations to them but also of the government's equitable obligations to see that the laborers and suppliers were paid. Accordingly, since it viewed the release as being required by contractual obligations and not voluntary in nature, the Court decided in favor of the surety. Citing Prairie, the Court concluded that the equity of a surety compelled to make payment was superior to that of a bank which had simply loaned money to the contractor to be used by him as he saw fit—either in the performance of the building contract or in the payment of his laborers, materialmen, and subcontractors. Id.

Taken together, Henningsen and Prairie established that where the government conceded itself to be a mere stakeholder and was not asserting any claim of its own to the contractual retainages and where, in fact, the surety had paid the obligations owed by the general contractor, the surety had priority over assignee banks as to the retainages regardless of whether the payment part or the performance portion of the suretyship bond was being invoked.[1] In the short span of twelve years, therefore, the historical primacy of sureties was reaffirmed. Later cases[2] have departed neither from the holding nor the ratio deciendi of Prairie and Henningsen. In fact, the same reasoning was relied upon to give the surety priority over earned but unpaid progress payments as well. As Circuit Judge Coffin stated in National Shawmut at pp. 844-5:

> Subrogation is an old term, rooted in equity, and semantically stemming from words meaning "ask under" . . . The equitable principle is that when one, pursuant to obligation—not a volunteer, fulfills the duties of another, he is entitled to assert the rights of that other against third persons.

> In this case, there is confusion because the tendency is to think of the surety on Miller Act payment and performance bonds as

---

[1] See American Surety Company of New York v. Westinghouse Electric Mfg. Co., 75 F.2d 377 (5th Cir. 1934), aff'd 206 U.S. 133 (1935), Martin v. National Surety Company, 85 F.2d 135 (8th Cir. 1936), aff'd 300 U.S. 588 (1937), Hardin County Savings Bank v. United States, 106 Ct. Cl. 577, 65 F.Supp. 1017 (Ct. Cl. 1944), Royal Indemnity Company v. United States, 117 Ct. Cl. 736, 93 F.Supp. 891 (Ct. Cl. 1950), National Surety Corporation v. United States, 132 Ct. Cl. 724, 133 F. Supp. 381 (Ct. Cl. 1955), cert. denied sub nom. First National Bank of Houston v. United States, 350 U.S. 902 (1955), Continental Casualty Company v. United States, 145 Ct. Cl. 99, 169 F.Supp. 945 (Ct. Cl. 1959), and Newark Insurance Company v. United States, 149 Ct. Cl. 170, 181 F.Supp. 246 (Ct. Cl. 1960).

[2] E.g., Pearlman v. Reliance Insurance Company, 371 U.S. 132 (1962), United Pacific Insurance Company v. United States, 162 Ct. Cl. 361, 319 F.2d 893 (Ct. Cl. 1963), Royal Indemnity Company v. United States, 178 Ct. Cl. 46, 371 F.2d 462 (1967), Fidelity and Deposit Company of Maryland v. United States, 183 Ct. Cl. 908, 393 F.2d 834 (Ct. Cl. 1968), National Shawmut Bank of Boston v. New Amsterdam Casualty Co., Inc., 411 F.2d 834 (1st Cir. 1969), Industrial Bank of Washington v. United States, 424 F.2d 932 (D.C. Cir. 1970). North Denver Bank v. United States, 193 Ct. Cl. 225, 432 F.2d 466 (Ct. Cl. 1970), Argonaut Insurance Company v. United States, 193 Ct. Cl. 483, 434 F.2d 1362 (Ct. Cl. 1970), and Great American Insurance Company v. United States, 492 F.2d 821 (Ct. Cl. 4).

standing in the shoes only of the entity it "insures"—the contractor . . . But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material-men who have been paid by the surety—who may have liens; and, not least, in the shoes of the government for whom the job was completed.

Applying these principles to the facts of the case before him, Judge Coffin then went on to declare at page 848:

Here the payments were earned but unpaid prior to the contractor's default. Prior to default, the contractor had the right to assign progress payments and had the Bank received payment, it could not (absent circumstances amounting to fraud) have been divested by the surety. But upon default, the surety which is obligated to complete the work steps into the shoes of the government —not of the contractor which on default has forfeited its rights. It is subrogated not only to the right of the government to pay laborers and materialmen from the funds retained out of progress payments but also to the government's right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default. (Citations omitted.)

But while Henningsen and Prairie established the priority of the surety as against all other general creditors of the prime contractor, they were silent as to whether or not the United States Government fell into that category. So things stood until 1947 when the Supreme Court decided United States v. Munsey Trust Company, 332 U.S. 234 (1947).

Unlike the situations in Prairie and Henningsen, the surety in Munsey chose a more powerful adversary: the United States Government. In May and July of 1940, six contracts were entered into between the United States and Federal Contracting Corporation for the painting and repair of various federal buildings. Pursuant to the recently enacted Miller Act, 49 Stat. 793, 40 U.S.C. § 270(a) et

seq., the Aetna Casualty and Surety Company signed performance and payment bonds for each contract. Each bond assigned to the surety the contractor's claims against the Government for sums due on the contracts whenever the surety should be compelled by default of the contractor to fulfill its obligations. Since the work was completed by the contractor and accepted by the government, the surety was not called upon to make good the promise of the performance bonds. However, the contractor had not paid some $13,000.00 to suppliers of labor and materials on the contracts. In view of the fact that the contractor had not paid these bills, the Government withheld payment of the retainages.

Meanwhile, in October of 1940, the Federal Contracting Corporation submitted a bid to the United States for another painting job. That bid was accepted but the contractor then failed to enter into a contract for the work. Another contractor was obtained by the government to perform the painting but at a cost of some $6,700.00 in excess of what it would have cost if Federal Contracting Corporation had undertaken performance at its bid price.

Subsequently, the surety paid all the indebtedness on the six earlier contracts as its payment bonds obliged it to do. But when the surety, through a receiver for the contractor, tried to collect the aforementioned retainages from the Government after having paid all the outstanding claims, the General Administrative Office deducted the Government's claim for damages on the latter job from the retainages. The receiver brought suit to collect the difference and the Court of Claims, relying upon Prairie and Henningsen, gave judgment to the receiver acting for the surety. The United States Supreme Court granted the Government's petition for certiorari and reversed, holding that the Government "has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in

his hands, in extinguishment of the debts due him". (Munsey at p. 239 citing Gratiot v. United States, 39 U.S. 336, 370 (1841) and McKnight v. United States, 98 U.S. 179, 186 (1874).)

The court acknowledged that if the party opposing the right of the United States to make the set-off had been the contractor instead of the surety, the case would have been an easy one. The presence of the surety was what complicated matters. Accordingly, the court considered four possibilities in terms of to whose rights the surety was subrogated. If the surety was subrogated to the rights of the prime contractor, then the Government had the right to set-off the debtor's money which it was holding against whatever debts it owed to him. (Munsey at p. 239.) If it was subrogated to the rights of the laborers and materialmen whom it had paid, then it lost out because those parties did not have enforceable rights against the United States for their compensation. (Id. at p. 241.) It could not, the Court reasoned, stand in the Government's shoes under the circumstances of this case for the Government did not retain the money to assure the laborers and materialmen that they would be paid by the prime contractor but rather to assure itself of timely completion. Hence, the surety's argument that since it had paid the suppliers it ought to be entitled to apply the security to indemnify itself was without merit. (Munsey at p. 243.) Finally, the Court denied that the surety had any rights of its own. As Mr. Justice Jackson stated at p. 244:

Respondent argues that if the work had not been completed, and the surety chose not to complete it, the surety would be liable only for the amount necessary to complete, less the retained money. Moreover, if the surety did complete the job, it would be entitled to the retained moneys in addition to progress payments. The situation here is said to be similar. But when a job is incomplete, the government must expend funds to get the work done, and is entitled to claim damages only in the amount of the excess which it

pays for the job over what it would have paid had the contractor not defaulted. Therefore, a surety would rarely undertake to complete a job if it incurred the risks that by completing it might lose more than if it had allowed the government to proceed. When laborers and materialmen, however, are unpaid and the work is complete the government suffers no damage. The work has been done at the contract price. The government cannot suffer damage because it is under no legal obligation to pay the laborers and materialmen. In the case of the laborers' bond, the surety has promised that they will be paid, not, as in the case of performance bond, that work will be done at a certain price. The law of damages is therefore not pertinent to the payment bond.

Munsey, it appears obvious, was confined to the situation where the surety was fighting with the Government over the amount of construction retainages to which it was entitled. As such, it should not have disturbed the holdings in Prairie and Henningsen which dealt with battles between sureties and banks. Nevertheless, Munsey caused a great deal of confusion and in its wake, several circuits held that the surety no longer was entitled to priority over the general creditors of the prime contractor.[3] Other Courts, however, continued to follow the Prairie-Henningsen rule.[4] Faced with this conflict, the Supreme Court granted certiorari in Pearlmen v. Reliance Insurance Company, 371 U.S. 132 (1962).

Pearlman was a dispute between the prime contractor's trustee in bankruptcy and his payment bond surety over the retainages due the contractor under its contract with the Government to do work on the St. Lawrence Seaway Project. Since the contractor had financial difficulties the United States agreed to terminate the aforementioned con-

[3] See, American Surety Company v. Hinds, 260 F.2d 366 (10th Cir. 1958) and Phoenix Indemnity Company v. Earle, 218 F.2d 645 (9th Cir. 1955).

[4] See, for example, In re Dutcher Construction Corporation, 298 F.2d 655 (2nd Cir. 1962), Continental Casualty Company v. United States, 145 Ct. Cl. 99, 169 F.Supp. 945 (1959), National Surety Corporation v. United States, 132 Ct. Cl. 724, 133 F.Supp. 381 (1955) and Royal Indemnity Company v. United States, 117 Ct. Cl. 736, 93 F.Supp. 891 (1950).

tract and hired another contractor to complete the job. Because several suppliers and laborers had not been paid, the government refused to pay over some $88,000.00 due the contractor under the contract. Instead, the Government turned the retainages over to the trustee in bankruptcy on the assumption that it had vested in him by operation of § 70 of the Bankruptcy Act, 30 Stat. 565 (1898), 11 U.S.C. § 110. The surety then paid approximately $350,-000.00 worth of claims and filed a petition alleging that it was the owner of the retainages and seeking an order directing the trustee in bankruptcy to pay over the fund to it. The bankruptcy referee refused to direct payment to the surety but ordered the surety's claim to be allowed as that of a general unsecured creditor. The District Court vacated the referee's order holding that Munsey had not changed the earlier line of cases which had determined the priority of the surety's position as against other unsecured general creditors in circumstances like this. The Second Circuit affirmed and the United States Supreme Court granted certiorari because of the conflicting results reached by the 2nd, 9th and 10th Circuits.

Justice Black, writing for the Court, felt that the issue was "whether the surety had, as it claimed, ownership of an equitable lien on, or a prior right to this fund before bankruptcy adjudication". 371 U.S. at p. 136. And, given the Prairie and Henningsen cases, the answer had to be that there was a security interest in a withheld fund to which the surety was subrogated—unless either the enactment of the Miller Act or the decision in Munsey had changed the law. As the Court stated at p. 137 of its opinion:

These two cases therefore, together with other cases that have followed them, establish the surety's right to subrogation in such a fund whether its bond be for performance or payment. Unless this rule has been changed, the surety here has a right to this retained fund. It is argued that the Miller Act changed the law as declared

382

in the Prairie Bank and Henningsen cases. We think not. (Footnotes omitted.)

The court found that the Miller Act had not altered the decisional law for neither the legislative history behind the act nor the language of the statute itself indicated such a purpose. Further, the mere fact that the Miller Act required a public surety to execute two bonds instead of the one formerly required was not significant inasmuch as the former single bond covered both payment and performance. 28 Stat. 278 (1894), as amended, 33 Stat. 811 (1905). Moreover, the Court also determined that Munsey had not altered Prairie or Henningsen and accordingly it affirmed the decision below. As Justice Black stated on pp. 140–142:

> The point at issue in that case [Munsey] was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we had . . . . We hold that Munsey left the rule in Prairie Bank and Henningsen undisturbed. We cannot say that such a firmly established rule was so casually overruled . . . .

> We therefore hold . . . that the government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and the materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it. (Footnotes omitted.)

With its decision in Pearlman, the Court clarified its position that the surety triumphs over both the lending bank and the trustee in bankruptcy with respect to both

retainages and earned but unpaid progress payments—regardless of whether the surety is proceeding under its payment or performance bond. However, the surety's position is inferior to that of the Government when the latter attempts to set-off amounts owed for back taxes from the retainages or withheld payments which the surety is seeking to obtain under its payment bond. Left unsettled were the priority positions if the surety was proceeding under its performance bond and whether the Government's set-off claim was as strong for liquidated damages as it was for taxes.

Later cases have answered these questions although the Supreme Court itself has not spoken out on the subject. The Government's right to set-off *liquidated damages* from the retainages, regardless of whether the surety was proceeding under its payment or performance bond, was established in United States v. Continental Casualty Company, 210 F.Supp. 433 (S.D.N.Y. 1962), North Denver Bank v. United States, 193 Ct. Cl. 225, 432 F.2d 466 (Ct. Cl. 1970), United States Fidelity & Guaranty Company v. United States, 201 Ct. Cl. 1, 475 F.2d 1377 (Ct. Cl. 1973), and Great American Insurance Company v. United States, 492 F.2d 821 (Ct. Cl. 1974). The inability of the Government to set-off taxes owing to it against the retainages when the surety was proceeding under its *performance bond* was announced by Trinity Universal Insurance Company v. United States, 382 F.2d 317 (5th Cir. 1967), cert. denied 390 U.S. 906 (1967), and followed in Security Insurance Company of Hartford v. United States, 428 F.2d 838 (Ct. Cl. 1970), United Pacific Insurance Company v. United States, 320 F.Supp. 450 (D. Or. 1970), Aetna Casualty and Surety Company v. United States, 435 F.2d 1082 (5th Cir. 1970), and United States v. United States Fidelity & Guaranty Company, 328 F.Supp. 69 (E.D.

Wash. 1971), affirmed 477 F.2d 567 (9th Cir. 1973). The opposite result when the surety is proceeding under its *payment bond* was reached in United Pacific Insurance Company v. United States, 162 Ct. Cl. 361, 319 F.Supp. 893 (Ct. Cl. 1963), Barrett v. United States, 177 Ct. Cl. 380, 367 F.2d 834 (Ct. Cl. 1966), Royal Indemnity Company v. United States, 178 Ct. Cl. 46, 371 F.2d 462 (Ct. Cl. 1967), cert. denied 389 U.S. 833 (1967), Security Insurance Company of Hartford v. United States, supra, North Denver Bank v. United States, supra, United States Fidelity & Guaranty Company v. United States, supra, Fireman's Fund Insurance Company v. United States, 362 F.Supp. 842 (D. Kan. 1973), and Great American Insurance Company v. United States, supra. And whether or not the surety can *recover* from the Government any payments it has made to the contractor or its assignee depends upon whether it has notified the Government as to its principal's failure to pay claims, whether the payments are final or only of the progress variety, and whether or not the contract was completed at the time the payments were made. Compare Newark Insurance Company v. United States, 144 Ct. Cl. 655, 169 F.Supp. 155 (Ct. Cl. 1959), Hanover Insurance Company v. United States, 279 F.Supp. 851 (S.D. N.Y. 1967), Home Indemnity Company v. United States, 180 Ct. Cl. 173, 376 F.2d 890 (Ct. Cl., 1967), Fireman's Fund Insurance Company v. United States, supra, and Great American Insurance Company, supra, with United Pacific Insurance Company v. United States, 176 Ct. Cl. 176, 362 F.2d 805 (Ct. Cl. 1966), Argonaut Insurance Company v. United States, 193 Ct. Cl. 483, 434 F.2d 1362 (Ct. Cl. 1970), and United States Fidelity & Guaranty Company v. United States, supra.

This memorandum, which constitutes part of the Opinion in American Fidelity Fire Insurance Company v. Construcciones Werl, Inc., et al. (filed November 24, 1975), analyzes the conflicting decisions rendered in Travelers Indemnity Company v. First National State Bank of New Jersey, 328 F.Supp. 208 (D.N.J. 1971) and Trans-Bay Engineers & Builders, Inc. v. Lynn, 396 F.Supp. 265 (D.D.C. 1975).

In Travelers, the surety and trustees in bankruptcy of the general contractor were seeking to recover funds held by Robert C. Weaver, then Secretary of HUD, as the assignee of an agreement entered into between the First National State Bank of New Jersey (the mortgagee therein) and HUD in accordance with the provisions of the National Housing Act, 12 U.S.C. § 1713(g), and 24 C.F.R. § 297.258.[1] The facts were as follows:

Carnell Construction Corp. (hereinafter CARNELL) entered into a contract with Munroe Towers, Inc. (hereinafter MUNROE) for the construction of a low-income housing project in Asbury Park, New Jersey on July 17, 1964. Travelers Indemnity Company (hereinafter TRAVELERS) became the surety on the project by furnishing the requisite payment and performance bonds. The necessary funds for the project were advanced by the First National State Bank of New Jersey (hereinafter BANK) through a mortgage which was insured by the Department of Housing and Urban Development pursuant to a letter of commitment issued by then Secretary Robert C. Weaver.

---

[1] This assignment occurred after default. Note, however, that 24 C.F.R. §§ 207.261, 236.251, and 236.260 provide for assignment even if there has been no default.

The project progressed according to plan until some time during the spring of 1966 when defaults in mortgage interest payments occurred as the building was nearing completion. The BANK elected to assign the mortgage to Secretary Weaver but without giving notice of default to CARNELL. Blissfully ignorant, CARNELL completed the project satisfactorily which fact is evidenced by MUNROE's acceptance and Secretary Weaver's and the BANK's approval. CARNELL and MUNROE applied for the retainages and escrow deposits but were refused. Whereupon the United States, as insurer and assignee of the mortgage loan, filed a complaint to foreclose the mortgage. CARNELL, being unable to make payments to its creditors (including labor and material subcontractors in connection with the project), went into Chapter XI arrangement proceedings, and TRAVELERS, after paying some $287,-833.29 in claims to materialmen and suppliers of CARNELL, joined with CARNELL's trustees in bankruptcy in bringing suit against the BANK and the Secretary of Housing and Urban Development to recover some $407,-897.25 in retainages and escrow deposits which HUD was holding pursuant to the statutorily authorized assignment.

TRAVELERS alleged that due to the failure of the BANK to give the requisite notice of default of MUNROE and to release the funds due and owing to MUNROE and CARNELL, CARNELL was unable to make payments to its creditors, including labor and material subcontractors in connection with the project, and went into Chapter XI arrangement proceedings under the Bankruptcy Act, 11 U.S.C. § 701 et seq. The surety was therefore called upon to satisfy the claims of all persons having contracts directly with CARNELL.

Accordingly, TRAVELERS asserted that by virtue of its having made the said payments it became, as surety upon its payment bond, subrogated to the rights of CAR-

NELL and the laborers and materialmen on the project. As an alternative theory of recover, TRAVELERS also alleged that the monies which the BANK failed to release were trust funds for the benefit of CARNELL and his laborers and materialmen which were diverted by the BANK and from the Secretary of HUD according to their respective liabilities.

In granting summary judgment for the plaintiffs, Judge Wortendyke stated:

> Although the parties did not discuss this suit as one substantially grounded in contract, we so view it. *This Court deems the plaintiffs to be creditor third party beneficiaries of the building loan agreement, and the Secretary to be the assignee of the said agreement.* The various pertinent statutes, regulations and agreements set up an elaborate system enabling the mortgagee to retain a portion of the funds payable under the building and loan agreement to insure the mortgagor's performance of his obligation to erect the project; upon completion of the project the disposal of the funds is also provided for. These various statutes and regulations and the building loan agreement are incorporated into the mortgage; accordingly when the mortgage was assigned, so were the rights and duties arising under it as well as those arising under incorporated agreements. (328 F.Supp. at p. 211; emphasis supplied.)

The Court then focused on the building loan agreement whereby the BANK became obligated to extend credit in the form of a loan to be secured by a mortgage and note and MUNROE became obligated to erect the housing project. In particular, Judge Wortendyke selected five clauses for closer scrutiny, to wit:

> (4) * * * Upon completion of the improvements * * * the balance due the Borrower hereunder shall be payable upon the expiration of 30 days from the date of final completion and acceptance of the project by the Lender with the approval of the Commissioner * * *.

> (5) * * * and the Borrower covenants that it will receive all advances hereunder as a trust fund to be applied first for the pur-

388

pose of paying for the cost of the improvements before using any part of the total of the same for any other purpose, but nothing herein shall impose upon the Lender any obligation to see to the proper application of such advances by the Borrower.

(10) If the Borrower at any time prior to the completion of the project abandons the same or ceases work thereon for a period of more than twenty (20) days or fails to complete the erection of the project strictly in accordance with the Drawings and Specifications, except as to changes approved herein provided by the Lender and the Commissioner or make changes in the Drawings and Specifications without first securing written approval of the Lender and the Commissioner, or otherwise fails to comply with the terms hereof, any such failure shall be a default hereunder, at the option of Lender, and the Lender may terminate this agreement, or the Lender, at its option, at any time thereafter may enter into possession of the premises and perform any and all work and labor necessary to complete improvements * * *. The Borrower hereby assigns and quit claims to the Lender all sums unadvanced under said mortgage and all sums due in escrow *conditioned upon the use of said sums in trust for the completion of the project, such assignment to become effective only in case of the Borrower's default.*

(13) Any "holdback" shall be payable upon completion of the entire project * * * to the satisfaction of the Lender and the Commissioner * * *.

(14) * * * As used in this instrument, the term "Lender" shall be deemed to include any person to whom the note hereinbefore mentioned and the mortgage securing the same shall be assigned with the consent of the Commissioner, and *this instrument shall be binding upon the parties hereto and their respective* successors and assigns. (308 F.Supp. at pp. 212–13. Emphasis in original.)

It is to be noted that clause 4 provides for the mortgagee's obligation to pay the mortgagor the "balance due" thirty days from the latter of final completion of the project or acceptance of the project by the mortgagee with the Federal Housing Commissioner's approval. Clause 5 purports to impress a trust upon the mortgagor to apply all advances received from the mortgagee first for the purpose of paying for the costs of improvements to the project.

Clause 10 specifies that in the event that the mortgagor defaults, the mortgagee has the alternative of either terminating the building loan agreement or else completing the project itself. Clause 13 tracks clause 4 in that it requires any "holdback" to be paid to the mortgagor upon the completion of the entire project to the satisfaction of the mortgagee and the Federal Housing Commissioner. Finally, clause 14 indicates that any assignee will be bound by the respective duties and obligations agreed to by the mortgagor and the mortgagee. This last clause therefore includes the Secretary of HUD within the definition of "lender" when there has been an assignment of the building loan agreement, mortgage, and note to him pursuant to the statutory provisions.[2]

Having singled out these five provisions of the building loan agreement, the Court went on to make two important observations. First, the encompassing of the Secretary of HUD within the definition of "lender" merely conformed to the statutory and regulatory definition of "mortgagee". (See footnote #2, supra.) And second, the Court felt that nothing in the above-described building loan agreement contravened or modified the basic regulatory obligation (24 C.F.R. § 207.3(b)) of the BANK and its assigns to extend the full amount of credit under the building loan agreement where there has been no notice of termination of the project and the project has been satisfactorily completed. (328 F.Supp. at p. 213.) Accordingly, the Court concluded that the express language of the building loan agreement operated to confer upon the plaintiffs rights against the Secretary of HUD. It then went on to declare at page 214:

---

[2] This definition, it should be noted, in fact mirrors the definition of "mortgagee" found in 12 U.S.C. §§ 1707, 1713(a) and 1715 z-1(j)(2)(C), and the regulations issued thereunder, to wit: 24 C.F.R. §§ 207.251(g) and 236.251.

We hold these agreements, statutes and regulations to be evidence of *the intent to bind the assignee-secretary to the obligation to extend the full amount of credit* and to make the appropriate payments *to the mortgagor or his creditors,* out of the transferred fund of monies. (Emphasis supplied.)

Having traversed this major hurdle, Judge Wortendyke continued:

It is this Court's determination that the plaintiffs herein fall within the ambit of those parties entitled to sue. When the term "creditors" from 24 C.F.R. § 207.3(B) is taken in its every day meaning the general contractor's trustees and his surety would be creditors. The bankrupt general contractor has constructed the project for the mortgagor and has not been paid the amount due under the cost plus construction contract . . . (and) it is now well settled that a surety who pays the debts of his principal is entitled to be subrogated to the extent required for reimbursement and may avail itself of all rights of the principal, Henningsen v. United States Fidelity and Guaranty Company, 208 U.S. 404, 28 S.Ct. 389, 54 L.Ed. 547 (1908), as well as the rights of the laborers and materialmen it has paid. National Surety Corp. v. United States, 133 F.Supp. 381, 132 Ct. Cl. 724 (1955). Although some confusion arose concerning the rights of a surety following the decision in United States v. Munsey Trust Company, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), the Supreme Court in Pearlman v. Reliance Insurance Company, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) clearly recognized and reaffirmed the basic rights of a surety. Although a surety's claim may be equitable in origin, it is nonetheless a creditor's claim. (Travelers at pp. 214–15.)

But the court was not content to rest its characterization of the surety as a creditor third-party beneficiary of the building loan agreement upon only one rationale. Therefore, Judge Wortendyke proceeded to develop his alternative ratio deciendi:

The second reason for deeming the contractor's trustees and surety to be creditor third party beneficiaries is the existing case law on the subject of third party beneficiaries. On our facts the mortgagor was at least in part acting as his own surety in that the

mortgage permitted the mortgagee to withhold retainages in accordance with 24 C.F.R. § 217.19(c)(6). In other suretyship problems arising under federal statutes it has been held that legislative intent is the guiding determinant of those parties who may or may not sue as a third party beneficiary. In Howard v. United States, 18 U.S. 676, 22 S.Ct. 543, 46 L.Ed. 754 (1901) when a suit was instituted on a bond required in conjunction with a federal employment contract, the Court held that the statute's intent governed those classes of persons entitled to assert a claim on the statutorily required bond and that the usual criterion for determining whether or not a party was a third party beneficiary, the intent of the parties at the time the agreement was negotiated, was not controlling. On our facts there is a minor distinction from the Howard bond. In Howard, the bond was required by statute, while here the de facto suretyship agreement was required by legislative and not administrative, regulations. Nevertheless, we do not deem such a difference to be fatal to the plaintiffs' theory of recovery. (Id. at p. 215.)

Having determined that the surety and co-trustees in bankruptcy had enforceable rights against the mortgagee by virtue of their status as creditor third-party beneficiaries of the building loan agreement, the Court turned to the mortgage and specifically to the clause therein which provided that the building loan agreement was incorporated by reference within to the same extent and effect as if it had been fully set forth and made a part of the mortgage itself. Therefore, the Court reasoned, the assignment of the mortgage brought about an assignment of the building loan agreement and was the "conduit for the duties and obligations concomitant thereto". (Travelers at p. 216.) Accordingly, Judge Wortendyke held that the surety and the trustee in bankruptcy were "entitled to payment out of the retainages transferred to the defendant Secretary". (Id.)

In Trans-Bay Engineers & Builders, Inc. v. Lynn, 396 F.Supp. 365 (D.D.C. 1975), the general contractor brought suit against the mortgagee and the Secretary of HUD seeking to recover certain sums retained as a "holdback" during

construction as well as payment for various modifications in the building plans. The facts were as follows:

In 1971, Trans-Bay Engineers & Builders, Inc. (hereinafter TRANS–BAY) entered into a contract with a non-profit, community-based group, More Oakland Residential Housing, Inc. (hereinafter MORH) for the construction of a 231 unit housing project for low- and moderate-income families. MORH, the project owner, also entered into mortgage and building loan agreements with Advance Mortgage Corporation (hereinafter ADVANCE), which mortgage HUD undertook to insure. HUD also agreed to subsidize the project with monthly interest reduction payments pursuant to section 236 of the National Housing Act, 12 U.S.C. § 1715z-1. TRANS–BAY completed construction of the project on schedule and, relying upon a provision in the construction contract with MORH, sought release of the funds retained during periodic construction advances. HUD refused to transmit the funds arguing that final closing arrangements were necessary, in addition to physical completion, before the final amount due to TRANS–BAY would be released from the mortgage proceeds. Meanwhile, MORH was unable to meet its interest payments to AD-VANCE, ADVANCE filed a formal notice of project default with HUD and, several months thereafter, notified HUD of its election to assign the outstanding mortgage to HUD. At the time of assignment, some $300,000.00 remained in undisbursed mortgage funds.

TRANS–BAY advanced three arguments in support of its claim of entitlement to the retention amount. First, it claimed a contractual right to payment from the undisbursed mortgage proceeds as a third party beneficiary to the building loan agreement between ADVANCE and MORH. Second, it argued that in view of the surety nature of the retention fund, its rights vested immediately upon completion of construction and therefore could not be de-

393

stroyed by a subsequent default by the mortgagor. Finally, it relied upon traditional equitable lien and unjust enrichment theories in support of its right to recovery. Judge Smith, writing for the D.C. District Court, was not impressed with any of the above contentions.

The D.C. District Court was acutely aware of the Travelers opinion and TRANS–BAY's reliance thereupon. However, while Judge Smith was in accord with the Travelers holding that a contractor may sue as a creditor beneficiary of a financing agreement made on his behalf, he felt that the third-party beneficiary was also bound by the terms and conditions of the contract which it sought to invoke. As he stated:

> The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract. Nor can the language of a single regulation be read in such an absolute way as to nullify conditions and restrictions imposed by a contract. In short, the Travelers court either did not consider or did not have before it the limitations in the building loan agreement which are present in the instant case. (396 F.Supp. at p. 290.)[3]

The court then went on to examine several provisions of its loan agreement in detail. Specifically, it referred to the following paragraphs contained therein:

4(a)
> The Borrower shall make monthly applications . . . for advances of mortgage proceeds from the Lender. Applications for advances with respect to construction items shall be for amounts equal to (i) the total value of classes of the work acceptably completed; plus (ii) the value of materials and equipment not incorporated in the work, but delivered to and suitably stored at the site; less (iii) 10 percent (holdback) and less prior advances.

---

[3] The regulation to which the Court was referring, 24 C.F.R. § 221.512, is incorporated into 24 C.F.R. § 236 through 24 C.F.R. § 236.1, and is identical with the regulation considered in the Travelers case (24 C.F.R. § 297.3(b)). It states: ("The mortgagee shall be obligated, as a part of the mortgage transaction, to disburse the principal amount of the mortgage to, or for the account of, the mortgagor or to his creditors for his account and with his consent".)

4(e)

*The Lender shall,* in accordance with the provisions of this agreement, *continue to advance to the Borrower funds out of the proceeds of the loan as long as the loan remains in balance and the Borrower is not in default hereunder* or under the Note or Mortgage." (See 396 F.Supp. at p. 268, n. 2 and p. 270. Emphasis supplied.)

Paragraph 4(e), in Judge Smith's opinion, clearly served to distinguish his case from Travelers. For the learned judge interpreted the aforementioned paragraph as clearly providing that MORH could claim no entitlement to further payment from ADVANCE once it had defaulted. Since MORH concededly went into default on its mortgage payments and inasmuch as TRANS–BAY (as a third-party beneficiary) assumed the legal rights and position of MORH, TRANS–BAY also could claim no entitlement to further payment either. (356 F.Supp. at p. 270.)

TRANS–BAY sought to avoid that default provision by arguing that since the "hold back" and escrow account funds served a suretyship function, its contractual right to the retention amount vested at a time prior to default by MORH; i.e., on the day when it had completed construction and fulfilled all necessary pre-conditions to payment. Judge Smith observed, however, that while the notice of default was not filed until over three months after HUD approved the cost certification for the project, on the very day of certification MORH's costs exceeded the balance of the mortgage proceeds. The shortfall itself constituted a default under the terms of the building loan agreement as well as under the regulations. (See 24 C.F.R. § 207.255 and 24 C.F.R. § 236.251.) This shortfall was never cured and, in particular, it was not cured before MORH's *later* default on its monthly interest payment obligations removed the possibility of curing the *earlier* default. Accordingly, the Court ruled that no rights vested

in TRANS–BAY during the period between submission or approval of cost certification documents and the later default by MORH. (Trans–Bay at p. 271.) Moreover, while acknowledging that courts had, in several cases, viewed the retention percentages as an indemnity or surety fund to assure completion of construction and to protect the surety company were it required to complete construction,[4] the Court proceeded to distinguish those cases:

> The present case, however, is distinguishable on its facts. Each of the above cases involved suits by a *surety company* to acquire retention amounts after payment had been made to laborers and materialmen following a contractor's default; the retainage sums were obviously not for the contractor's benefit, but principally for the protection of the surety. . . . But most important of all, there are explicit contractual provisions and undertakings between the parties in this case, discussed supra that govern the release of the retention amount. These terms were not present in the above cases, and cannot be nullified in the contracts before the Court by the invocation of the surety doctrine. (Trans-Bay at p. 272. Emphasis in the original.)

Having disposed of the general contractor's contractual and suretyship claims, the Court summarily considered the equitable lien and unjust enrichment contentions.

> Likewise, equitable lien principles cannot create vested rights in Trans-Bay which are contrary to express and implied contractual undertakings. It may be that Trans-Bay has completed its construction obligations down to the last nail in the building, that it is wholly without fault in the project's financial failure, and that it has relied exclusively upon the mortgage fund as a source for payment of the retention sum. It may also be, as in G. L. Wilson Bldg. Co. v. Leatherwood, 268 F.Supp. 609, 622, (D.C.N.C. 1967), that "[t]he United States at all times was fully acquainted with each step however minute, that took place from the very inception of the

---

[4] The Court cited Pearlmen v. Reliance Insurance Company, 371 U.S. 136–42 (1962), Henningsen v. United States Fidelity & Guaranty Company, 207 U.S. 404, 410–11 (1908), and Travelers Indemnity Company v. First National State Bank of New Jersey, 328 F.Supp. 208, 215–16 (D. N.J. 1971).

dealings herein, down to and including the absolute completion of the project." Still, equity will not set aside legal obligations in order to provide relief for parties later disadvantaged, nor will equity rewrite contracts to expand an insurer's liabilities or to restrict a promisee's risks and duties. In the present case, there has also been no convincing demonstration of the comparative value of Trans-Bay's performance vis-a-vis the total injury caused to HUD by the default. See 5A Corbin on Contracts § 1125 (1951) (Defaulting Contractor). Equitable principles are thus unavailing to plaintiff Trans-Bay. (396 F.Supp. at p. 272.)

Having spent a not inconsiderable amount of time in discussing these two cases, it might be useful to reiterate certain salient features of each by way of comparison. Travelers involved a suit by the *surety* and co-trustees in bankruptcy of the general contractor whereas, in Trans–Bay, the general contractor himself was the moving party. In both situations, the project owner (mortgagor) occasioned the default by failing to make monthly interest payments. In both cases also, the contractor satisfactorily completed construction and the project was accepted by the mortgagor with the mortgagee's and HUD's approval. In one case (Travelers), the default occurred prior to successful completion of the project but construction continued until completion. In the other, default did not occur until after completion and approval. Both courts held that the plaintiffs (in the one case, the surety and co-trustees in bankruptcy, in the other, the general contractor) to be creditor third-party beneficiaries of the building loan agreement. Both judges also concurred that the suit was one for recovery of undisbursed mortgagee proceeds and, as such, was founded upon the building loan agreement and governed by its terms. Any provisions in the construction contract, favorable or otherwise, were not controlling and could not be relied upon. Finally, both Judge Wortendyke and Judge Smith agreed that HUD was the proper defendant by virtue of the statutorily-authorized and contrac-

tually-provided for assignment and that the mortgagee could not be held liable for the undisbursed mortgage proceeds because of that same assignment. It is at this point, however, that the similarities cease.

In Travelers, the surety was proceeding under its payment bond and the Court held that the surety was entitled to the undisbursed mortgage proceeds by finding the surety to be a creditor third-party beneficiary of the building loan agreement under both traditional contractual and suretyship doctrines governing third parties and explicit HUD regulations and provisions in the building loan agreement specifying the mortgagee's obligations. However, the Court did hint that had the mortgagor given the requisite notice to the general contractor, the plaintiffs would not have been entitled to assert any claim for monies due and owing for work performed *after* the notice of default. (328 F.Supp. at p. 217.) In Trans–Bay, on the other hand, the Court held that the general contractor could not recover the undisbursed mortgage proceeds because, as a third-party beneficiary of the building loan agreement, it was bound by provisions contained therein providing that the mortgagor had no rights to the proceeds after its default. Furthermore, the Court held that suretyship doctrines or other equitable theories could not be invoked to award the general contractor the proceeds since invocation of those doctrines would nullify the express terms of the building loan agreement.

The preceding features of the two aforementioned cases have been emphasized because they are significant when juxtaposed to the circumstances in the matter sub judice. As in Travelers, this is a suit brought by the surety—but here it is proceeding under its performance bond. The instant controversy's catalyst, as in both Trans–Bay and Travelers, was the mortgagor's failure to make monthly interest payments. Again, as in both cases, the project has

been accepted by the mortgagor-owner (FOUNDATION) with HUD's approval. The default here, as was the situation in Travelers, occurred prior to the successful completion of the project, but nevertheless the project was later acceptably completed. Here, however, the general contractor went into bankruptcy prior to the mortgagor's default and it was the surety, not the contractor, who completed construction. Moreover, the surety's role was not limited to one of merely paying claims. It also undertook to finish physical construction of the housing project.

Having noted these various key differences and similarities, this Court is *not* about to assign weights, aggregate the weighted values, and come up with a conclusion that since the facts of this case are closer to case A than to case B, the holding of case A should be followed while that of case B distinguished. We have highlighted these points precisely because this Court wishes to make it clear that these are *only* factors which the Court has taken into consideration, along with many others, in reaching its independent conclusion. We therefore refuse to set ourselves up as a Court of Appeals in judging whether Judge Smith or Judge Wortendyke was correct in reaching the decisions which they did under the circumstances of their respective cases.